(C. D. 199)

STANDARD OIL CO. OF LOUISIANA *v.* UNITED STATES

United States Customs Court, First Division

(Decided August 14, 1939)

*Sharretts & Hillis* (*Edward P. Sharretts* and *Arthur L. Tallman* of counsel) for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector* and *Richard F. Weeks*, special attorneys), for the defendant.

Before McCLELLAND, SULLIVAN, and BROWN, Judges; BROWN, J., concurring

McCLELLAND, Presiding Judge: These protests were originally the subject of decision by this division of the court reported in *Standard Oil Co. of Louisiana* v. *United States*, C. D. 39. Within the time prescribed by section 518 of the Tariff Act of 1930 a motion for rehearing was made by counsel for the plaintiff, which was granted. On the rehearing the protests were submitted on the record originally made and a stipulation of additional facts.

The statement of the facts and the issue in the opinion of the majority of this division reported as C. D. 39, *supra*, read as follows:

We have here three protests each against the action of the collector of customs at the port of New Orleans assessing a tax at the rate of ½ cent per gallon under the provisions of Section 601 (c) (4) of the Revenue Act of 1932 on part of an importation of fuel oil which had been entered for warehouse. It is claimed in each of the protests that the oil in issue was withdrawn with the express purpose of being put on board of an American vessel engaged in foreign trade, and was therefore not subject to any duty or tax by virtue of section 630 of the Revenue Act of 1932.

It is disclosed by the record made on the hearing of these protests that 2,722,110 gallons of fuel oil were imported into the port of New Orleans on the Motorship *Cleopatra* on December 24, 1935, and that, among others, three withdrawals were made therefrom, one on December 30, 1935, of 316,968.86 gallons, of which 183,361.92 gallons were sold to the Mississippi Shipping Co. and supplied to the S. S. *Delmundo*, and two on January 6, 1936, of 281,293.32 and 140,511.42 gallons, respectively, of which a total of 253,080.24 gallons were sold to the Mississippi Shipping Co. and supplied to the S. S. *Delmundo*.

Following these withdrawals and on February 18, 1936, the collector liquidated the entry, assessing a tax, as aforesaid, at the rate of ½ cent per gallon under the provisions of section 601 (c) (4) of the Revenue Act of 1932 on the entire quantity of oil imported. As to the oil covered by these withdrawals which was supplied to the S. S. *Delmundo* duty was not paid until after September 23, 1936, upon which day the collector addressed to the protestant the following notice:

Notice of Duties Due

UNITED STATES CUSTOMS SERVICE

*District No. 20.   Port of New Orleans, La., Sept. 23, 1936*

To: Standard Oil Company of Louisiana, New Orleans, La.
There is due the United States, on W. H. entry No. 375, 12–26–35 liquidated 2–18–36:
Supplemental duty_____ $6, 059. 13
                                                                    ————————
      Total_____ 6, 059. 13
I certify that this amount is correct.

A. Miles Pratt,
*Collector of Customs.*
by E. Bleist.

The actual date of payment of such duties was October 23, 1936, more than eight months after the date of liquidation. On November 17, 1936, following such payments, each of these protests was filed against the action of the collector, and when the protests came on to be heard at the port of New Orleans Government counsel, preliminary to such hearing and at the close thereof, moved that each of the protests be dismissed on the ground that none of them was filed within the statutory time allowed therefor.

The majority of the division was of the opinion, and so held, that on the record made the motion to dismiss must be granted since the protests were not made within 60 days after the liquidation of February 18, 1936, which, on the 61st day thereafter became final and conclusive upon all parties.

The stipulation of additional facts introduced into the record on the rehearing reads as follows:

It is stipulated and agreed, by and between the parties in the above-entitled cause, as follows:

Warehouse Entry No. 375 was made by plaintiff on December 24, 1935, covering 2,722,110 gallons of fuel oil.

In December of the same year and January of 1936, the said 2,722,110 gallons were released conditionally free of tax to be supplied to vessels engaged in foreign trade. The oil was supplied to 12 vessels and was the subject of eleven withdrawal entries. Three of the vessels to which the oil from this entry was supplied were the "Delalba," "Delmundo," and the "Clearwater."

On February 18, 1936, Warehouse Entry No. 375 was liquidated in the usual course of business without regard as to how the fuel oil in question was withdrawn from warehouse. It was liquidated on the basis of the landed quantity, at the rate of ½¢ per gallon under Section 601 (c) (4) of the Revenue Act of 1932. The total amount of duty found in liquidation was then set up on the warehouse books to be credited on the warehouse bond if the Collector finally decided that the vessels to which the fuel oil had been supplied conditionally free of tax were entitled to receive the fuel oil free of the tax under Section 309 of the Tariff Act of 1930 or Section 630 of Title IV of the Revenue Act of 1932.

The liquidation of the warehouse entry on February 18, 1936, decided the taxable status of the fuel oil as entered. In the liquidation of February 18, 1936, the Collector did not decide whether or not the fuel oil supplied to the steamship *Delmundo* was entitled to exemption from the tax under Section 630 of the

Revenue Act of 1932 or Section 309 of the Tariff Act of 1930. In the liquidation of February 18, 1936, the Collector did not decide whether or not the steamship "Delmundo" was actually engaged in foreign trade.

On September 23, 1936, the Collector of Customs at the port of New Orleans decided that the steamships "Delalba," "Delmundo," and "Clearwater" were not actually engaged in foreign trade within the meaning of Section 309 of the Tariff Act of 1930 and Section 630 of Title IV of the Revenue Act of 1932 because the said vessels left port under enrollment, and demanded the tax upon the 1,211,-823.90 gallons of fuel oil which had been supplied to said three vessels under conditional free permits. The decision of the Collector of September 23, 1936, was officially approved by the Commissioner of Customs on October 6, 1936.

The decision of the Collector of September 23, 1936, and the decision of the Commissioner of Customs of October 6, 1936, are the only decisions holding that the fuel oil supplied to the said steamship "Delmundo" was not exempt from the tax provided for in Section 601 (c) (4) of the Revenue Act of 1932.

The status of the vessels taking on board the said fuel oil withdrawn from bonded warehouse as vessels' supplies formed no part of the liquidation of the entry (No. 375) of February 18, 1936, and was not considered therewith.

It is further stipulated and agreed, that the attached photostatic copies of letters from the Assistant Collector of Customs at the port of New Orleans and the Assistant Collector at the port of New York are true copies of the originals attached to plaintiff's application for rehearing and shall be received in evidence as showing the procedure followed in said ports with respect to the liquidations and decisions covering bonded fuel oil withdrawn under conditional free permits to be supplied to vessels claimed to be within the provisions of Section 309 of the Tariff Act of 1930 and Section 630 of the Revenue Act of 1932.

The letter of the assistant collector of customs at the port of New Orleans, referred to above, reads as follows:

TREASURY DEPARTMENT,
UNITED STATES CUSTOMS SERVICE,
*New Orleans, La., November 15, 1938.*

STANDARD OIL COMPANY OF LOUISIANA,
LAW DEPARTMENT,
*New Orleans, La.*

GENTLEMEN: Receipt is acknowledged of your letter of the 10th instant, in which you request to be advised as to the practice followed at this port relative to the liquidation of warehouse entries covering importations of fuel oil withdrawn from bonded warehouse for fuel supplies on vessels actually engaged in foreign trade within the provisions of Section 601 (c) (4) and Section 630 of Title IV of the Revenue Act of 1932.

You state that the questions you are particularly interested in are as follows:

(1) Where the warehouse entry is liquidated after the fuel oil described in Section 601 (c) (4) is withdrawn from bonded warehouse under conditional free withdrawal permits to be supplied to vessels actually engaged in foreign trade as provided in Section 630 of the Revenue Act of 1932, how is the warehouse entry liquidated?

The warehouse entry is liquidated in the usual course of business without regard as to how the merchandise in question is eventually withdrawn from warehouse. It is liquidated on the basis of the landed quantity, at the rate of ½¢ per gallon under Section 601 (c) (4) of the Revenue Act of 1930. The total amount of duty found in liquidation is then set up on the warehouse books and collected if the merchandise is withdrawn from the warehouse for consumption, or properly

credited if withdrawn for transportation and exportation, or conditionally free under Section 309 of the Tariff Act of 1930.

(2) When and how does the Collector finally decide whether or not fuel oil classified in Section 601 (c) (4) is entitled to exemption from the imposition of the tax as allowed by Section 630?

The withdrawal of fuel oil from bonded warehouse as vessels' supplies is made on Customs Form 7506, conditionally free of tax. As soon as practicable after the oil has been laden on the vessel involved, the Marine Division of this office certifies on the withdrawal form that the vessel is engaged in foreign trade and is, therefore, entitled to take the fuel oil on board free of tax. This, ordinarily, should be final, so far as the taxable status of the oil is concerned. However, should it be discovered thereafter that the vessel has violated the provision of the law and the regulation under which it was permitted to withdraw fuel oil from bonded warehouse free of tax, a demand for payment of the said tax will be made by the Collector.

(3) In view of the decision of the United States Customs Court in Standard Oil Company of Louisiana v. United States (C. D. 39), will your office hereafter finally decide the status (under Section 630) of vessels to which the fuel oil is supplied, at the time of or as part of the liquidation of the warehouse entry, or will your office withhold the liquidation of the warehouse entry until the status of such vessels is finally decided by the Collector?

As the status of the vessel taking on board fuel oil withdrawn from bonded warehouse as vessels' supplies forms no part of the liquidation of the entry, it will not be considered therewith. Nor will this office withhold the liquidation of the warehouse entry until the status of such vessels is finally decided by the collector, inasmuch, as previously-stated, the said status bears no relation to the liquidation of the entry.

Respectfully,

M. L. LeBlanc,
*Assistant Collector.*

Manifestly, any decision on the question of the timeliness of the protests depends upon a determination of whether the liquidation of February 18, 1936, decided the dutiable status of the merchandise involved *at the time of its withdrawal* so that if not protested within sixty days under the provisions of section 514 of the Tariff Act of 1930 the plaintiff would have lost the right to protest the imposition of the tax and claim exemption therefrom under the provisions of section 630, *supra.*

Section 505 of the Tariff Act of 1930 provides that—

Upon receipt of the appraiser's report and of the various reports of landing, weight, gauge, or measurement the collector shall ascertain, fix, and *liquidate* the rate and amount of duties to be paid on such merchandise. * * *

It will be seen that the foregoing language is unconditional and applies as well to warehouse entries as to entries for consumption. In connection with merchandise entered for warehouse, however, it is well understood by those familiar with the tariff that the dutiable status of the merchandise may change after importation and deposit in warehouse, either by withdrawal for exportation under the provisions of section 557 of the Tariff Act of 1930, manipulation in ware-

house and subsequent withdrawal under the provisions of section 562 of the same act, or withdrawal for use as supplies for certain vessels under the provisions of either section 309 of the Tariff Act of 1930 or section 630 of the Revenue Act of 1932.

In the case of merchandise withdrawn under the provisions of section 557, *supra*, the tariff act provides that such withdrawal may be made "without the payment of duties thereon"; merchandise withdrawn under the provisions of section 309 of the same act may be so withdrawn "free of duty or internal-revenue tax"; and merchandise withdrawn after manipulation in warehouse under the provisions of section 562 of the same act may be so withdrawn and exported "without the payment of duties," or withdrawn for consumption "upon payment of the duties accruing thereon, in its condition and quantity, and at its weight, at the time of withdrawal from warehouse, with such additions to or deductions from the final appraised value as may be necessary by reason of change in condition." In the case of merchandise withdrawn under the provisions of section 630 of the Revenue Act of 1932 it is provided that "no tax * * * shall be imposed" upon such merchandise.

For reasons connected with the normal business administration of customs matters some time may elapse between entry of merchandise for warehouse and liquidation of the entry. In some cases, as in the case at bar, the status of the merchandise may change before the act of liquidation is performed. Even though the status of the merchandise has changed, however, it is clear from a reading of the statute that the liquidation required thereby is that based upon the condition of the merchandise as it was imported. Section 505, *supra*, provides that—

upon receipt of the appraiser's report and of the various reports of landing, weight, gauge, or measurement the collector shall ascertain, fix, and liquidate the rate and amount of duties to be paid on such merchandise as provided by law.

The reports thus specified refer to the merchandise in its condition as imported, so that it is obvious that liquidation must be based upon the status of the merchandise at that time. The liquidation of February 18, 1936, in the instant case did not, therefore, determine the dutiable status of the merchandise as withdrawn, but determined its dutiable status as imported.

Since, as hereinbefore pointed out, the tariff and revenue acts provide for exportation of merchandise entered for warehouse under certain conditions either *without the payment* of duty or tax thereon, or *without the imposition* of duty or tax thereon, it must follow that a collector's decision assessing or demanding payment of duty or tax, as the case may be, on merchandise claimed to have been withdrawn under any of the provisions above cited, is properly the subject of protest, and the time within which the protest must be filed begins to

run from the date of the assessment or demand, as the case may be. It should be noted that the demand referred to is not an ordinary demand for the payment of duties following liquidation, but is in effect a determination by the collector that the dutiable status of the merchandise has not changed by reason of withdrawal thereof and exportation or lading as supplies.

In the case at bar it is clear that the decision of the collector that the withdrawal and lading as fuel supplies of the oil in question did not change its dutiable status was made on September 23, 1936, and the protests having been filed within 60 days thereafter were timely. The motion made by the Government to dismiss the protests is therefore denied, and we proceed to a decision of the issue on the merits.

The record shows that the S. S. *Delmundo* was operated on a regular schedule from New Orleans to gulf ports to pick up cargo for South America and to discharge cargo from South America, return to New Orleans to pick up cargo there for South America, and clear for South American ports, such as Rio de Janeiro, Santos, and Victoria, Brazil, Montevideo, Uruguay, and Buenos Aires, Argentina, to discharge and receive cargo for the north-bound voyage which ended at New Orleans, the round trip taking 84 days. The scheduled voyages began and ended at New Orleans. At the time the oil in question was laden on board the vessel had completed the fifteenth of such voyages and was preparing for the sixteenth.

It also appears from the record that the *Delmundo* had been purchased by the Mississippi Shipping Co. from the United States Shipping Board and that one of the conditions of the agreement was that the vessel could be used only in foreign trade between the gulf ports and ports of South America. For that reason, among others, no domestic cargo was carried to or from domestic ports.

The *Delmundo* arrived at New Orleans from Victoria, Brazil, on January 9, 1936, carrying coffee and general cargo. She discharged at New Orleans between January 9 and January 13, and in the meantime underwent voyage repairs and took on the fuel oil in question. Upon her arrival at New Orleans from Victoria as aforesaid, the *Delmundo* surrendered her certificate of registry and obtained a certificate of enrollment, as under the navigation laws of the United States she was entitled to do (title 46, U. S. C. A., chap. 12, sec. 264).

The purpose of surrendering the certificate of registry was stated by witness Pate, the operating manager for the Mississippi Shipping Co., as follows:

When vessels discharge their complete cargo at New Orleans we sometimes place them under enrollment for the passage from New Orleans to the first loading port. We do that for two reasons, first, that the time on the passage between ports in the Gulf of Mexico is a very important factor. By placing the vessels under enrollment we take a pilot at our dock in New Orleans and this pilot with-

out interruption carries its crew into the dock at the first port of arrival. So we lose no time stopping for pilots down at South Pass and at Sand Island or Pensacola, Florida, as the case may be, to change pilots. That is the first consideration, time.

The second is the fact that we can get the pilot to do this work for less than we would pay the three pilots which we would be forced to use when a vessel makes the same passage under registry. We save money. So time and money, those are the two reasons.

On January 13 the *Delmundo* left New Orleans for Pensacola in ballast for the purpose of taking on cargo for South America. At Pensacola the vessel took on such cargo and surrendered her enrollment for temporary registry on January 17, sailing on the same day bound for Buenos Aires via Mobile, New Orleans, Rio de Janeiro, Santos, and Montevideo. At New Orleans on January 24 the *Delmundo* secured permanent registry under which she completed the voyage.

Section 630 of the Revenue Act of 1932 under which exemption from the tax imposed under the provisions of section 601 (c) (4) of the same act is claimed reads as follows:

SEC. 630. EXEMPTION FROM TAX OF CERTAIN SUPPLIES FOR VESSELS.

Under the regulations prescribed by the Commissioner, with the approval of the Secretary, no tax under this title shall be imposed upon any article sold for use as fuel supplies, ships' stores, sea stores, or legitimate equipment on vessels of war of the United States or of any foreign nation, vessels employed in the fisheries or in the whaling business, or actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions. Articles manufactured or produced with the use of articles upon the importation of which tax has been paid under this title, if laden for use as supplies on such vessels, shall be held to be exported for the purposes of section 601 (b).

It is clear that the collector refused to allow exemption from the tax under the provisions of section 630, *supra*, on the fuel oil in question for the reason that at the time of lading such oil the vessel was not documented for the foreign trade, i. e., instead of being a registered vessel she was an enrolled vessel.

The distinction between registry and enrollment is well brought out in the decision of the Supreme Court written by Mr. Justice Miller in the case of *Badger* v. *Gutierez*, 111 U. S. 734, wherein the court said:

It is to be understood that every vessel of the United States which is afloat is bound to have with her from the officers of her home port either a register or an enrollment. The former is used when she is engaged in a foreign voyage or trade and the latter when she is engaged in domestic commerce, usually called the coasting trade. If found afloat, whether by steam or sail, without one or the other of these, and without the right one, with reference to the trade she is en-

gaged in or the place where she is found, she is entitled to no protection under the laws of the United States, and is liable to seizure for such violation of the law, and in a foreign jurisdiction or on the high seas can claim no rights as an American vessel.

Article 455 (b) of the Customs Regulatiɔns of 1931, prescribed by the Commissioner of Customs with the approval of the Secretary of the Treasury under the authority of section 630, *supra*, and in effect at the time of the withdrawal and lading of the oil in question, reads as follows:

Unless a vessel is operating on a regular schedule in a class of trade which entitles it to the privilege, it is not considered to be actually engaged in the foreign trade, or in trade between the Atlantic and Pacific ports of the United States or between the United States and its possessions unless it actually clears from the port where the withdrawal is made for a foreign port, a port on the opposite coast of the United States, or clears from a port in the United States to a port in one of its possessions (or vice versa), as the case may be; but the fact that a vessel so clearing intends to stop at an intermediate port before reaching the port for which it cleared, for the purpose of lading or unlading cargo or passengers, will not debar it from claiming the privilege.

This regulation therefore defines vessels entitled to the exemption as follows:

(1) Vessels operating on a regular schedule in a class of trade enumerated in the statute, i. e., foreign trade, trade between the Atlantic and Pacific ports of the United States, or between the United States and its possessions.

(2) Vessels *not* operating on a regular schedule but which clear from the port where the withdrawal was made for—

(a) a foreign port,

(b) a port on the opposite coast of the United States, or

(c) a port in one of its possessions (or *vice versa*) whether or not such vessel intends to stop at an intermediate port before reaching the port for which it cleared.

The uncontroverted evidence in the case at bar shows that at the time the oil in issue was laden aboard the *Delmundo* she was operating on a regular schedule in the foreign trade. It is true that from the time she surrendered her registry on January 9 in New Orleans until she acquired temporary registry in Pensacola on January 17 the *Delmundo* was prohibited from proceeding on a foreign *voyage*. Section 278 of chapter 12, title 46, U. S. C. A., reads as follows:

If any vessel, enrolled or licensed, shall proceed on a foreign voyage, without first giving up her enrollment and license to the collector of the district comprehending the port from which she is about to proceed on such voyage, and being duly registered by such collector, every such vessel, together with her tackle, apparel, and furniture, and the merchandise so imported therein, shall be liable to seizure and forfeiture.

In the case of *The Lark*, Fed. Cas. 8,090, it was held that a "foreign voyage" means "a voyage intended to some place within. the jurisdiction of a foreign country, or at least without the territorial waters of the United States," and in *The Winnie*, 65 F. (2d) 706, it was held that—

so long as a vessel is passing from one port of the United States to another, she may keep as far from shore as she pleases without incurring penalty for proceeding on "foreign voyage" without first giving up her enrollment and license.

The schedule of the *Delmundo* called for stops at Pensacola, Mobile, and New Orleans to pick up cargo for South American ports. These stops were as much part of her schedule while engaged in the foreign trade as the calls at Rio, Santos, Victoria, Montevideo, and Buenos Aires. The sole purpose thereof was to lade foreign-bound cargo for carriage without transshipment to foreign ports. In *United States* v. *Patten*, Fed. Cas. 16,007, "foreign trade" is defined as—

the exportation and importation of commodities to or from foreign countries as distinguished in the United States from interstate or coastwise trade.

The loading of cargo at Pensacola, Mobile, and New Orleans destined for South America was not interstate or coastwise trade, but foreign trade, and since it was necessary for the *Delmundo* to proceed first to Pensacola for such purpose on her regular schedule the voyage made from New Orleans to Pensacola in ballast must also be considered as part of the operation of the vessel in the foreign trade. Viewed as a whole, therefore, the entire round trip made by the *Delmundo* from New Orleans to Pensacola, Pensacola to Mobile, Mobile to New Orleans, New Orleans to South America, and South America to New Orleans, was made in the foreign trade, and each of the separate voyages made from port to port, which all together made up the round trip, was likewise made in the foreign trade.

We are satisfied from the evidence before us that the *Delmundo* at the time the oil in question was laden aboard her met the requirement of the statute as a "vessel   *   *   *   actually engaged in the foreign trade" and the requirement of the customs regulations as a "vessel *   *   *   operating on a regular schedule" in the foreign trade.

Each of the protests, claiming that the oil was, by reason of having been withdrawn for use as supplies of a vessel actually engaged in the foreign trade, entitled to exemption from the tax imposed under the provisions of section 630 of the Revenue Act of 1932, is therefore sustained. Judgment will issue accordingly.

BROWN, Judge: I concur for the reason stated in my dissenting opinion in the original decision of this case, C. D. 39, decided October 6, 1938.