STANDARD OIL COMPANY OF NEW JERSEY *v.* UNITED STATES (No. 4490)[1]

---
[1] C. A. D. 306.

United States Court of Customs and Patent Appeals, March 6, 1945

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for appellant.

*Paul P. Rao*, Assistant Attorney General (*Sybil Phillips* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.

[Oral argument February 6, 1945, by Mr. Sharretts and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court (Third Division) holding 66,601 gallons of fuel oil, withdrawn from bonded warehouse for use as fuel supplies on the steamship *Caracas*, subject to an internal revenue tax of ½ of 1 cent per gallon under section 601 (c) (4) of the Revenue Act of 1932 (47 Stat. 259), as assessed by the collector at the port of New York.

Counsel for appellant contended before the court below, and contend here, that the fuel oil is not subject to the internal revenue tax assessed against it, and rely upon the provisions of section 309 (a) of the Tariff Act of 1930, section 630 (enacted July 1, 1933) amending the Revenue Act of 1932 (53 Stat. 419, 26 U. S. C. § 3451, T. D. 46522), and article 464 (c) (4) of the Customs Regulations, 1937.

The provisions in question read, respectively, as follows:

SEC. 601. EXCISE TAXES ON CERTAIN ARTICLES.

\* \* \* \* \* \* \*

(c) There is hereby imposed upon the following articles sold in the United States by the manufacturer or producer, or imported into the United States, a tax at the rates hereinafter set forth, to be paid by the manufacturer, producer, or importer:

\* \* \* \* \* \* \*

(4) Crude petroleum, ½ cent per gallon; fuel oil derived from petroleum, \* \* \* ½ cent per gallon \* \* \*. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles.

SEC. 309. SUPPLIES FOR CERTAIN VESSELS.

(a) EXEMPTION FROM CUSTOMS DUTIES AND INTERNAL-REVENUE TAX.— Articles of foreign or domestic manufacture or production may, under such regulations as the Secretary of the Treasury may prescribe, be withdrawn from bonded warehouses or bonded manufacturing warehouses free of duty or internal-revenue tax for supplies (not including equipment) of vessels of war, in ports of the United States, of any nation which may reciprocate such privilege toward the vessels of war of the United States in its ports, or for supplies (not including equipment) of vessels of the United States employed in the fisheries or in the whaling business, or *actually engaged* in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions, but no such articles shall be landed at any port or place in the United States or in any of its possessions. [Italics ours.]

## SEC. 630. EXEMPTION FROM TAX OF CERTAIN SUPPLIES FOR VESSELS.

Under regulations prescribed by the Commissioner, with the approval of the Secretary, no tax under this title shall be imposed upon any article sold for use as fuel supplies, ship's stores, sea stores, or legitimate equipment on vessels of war of the United States or of any foreign nation, vessels employed in the fisheries or in the whaling business, or *actually engaged in* foreign trade or *trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions.* * * * [Italics not quoted.]

ART. 464 EXEMPTION FROM CUSTOMS DUTIES AND INTERNAL-REVENUE TAX.—

(a) Tariff Act of 1930, section 309 (a):

*    *    *    *    *    *    *

(c) A vessel is *not* considered to be actually engaged * * * in trade between the Atlantic and Pacific ports of the United States, or between the United States and its possessions, as the case may be, unless it is— [Italics ours.]

(1) Operating on a regular schedule in a class of trade which entitles it to the privilege;

(2) Actually transporting passengers or merchandise to or from * * * a port on the opposite coast of the United States, or between a port in a possession of the United States and a port in the United States or in another of its possessions;

*    *    *    *    *    *    *

(4) Departing in ballast from the port at which the withdrawal is made directly for a foreign port, a port on the opposite coast of the United States, a port in one of the possessions of the United States, or, where the port of withdrawal is in a possession of the United States, departing directly for a port in the United States or in another of its possessions.

On the trial below, counsel for the parties entered into a stipulation which, so far as pertinent, reads:

(1) That the 66,601 gallons of fuel oil covered by the above protest was imported into the United States at the port of New York, and entered into bonded warehouse under Warehouse Bond No. 103864 of January 24, 1938.

(2) That the said 66,601 gallons of fuel oil were sold by the Standard Oil Company of New Jersey for use as fuel supplies on the steamship "Caracas."

(3) That at the time of said sale the steamship "Caracas" was under United States registry, and was at the port of New York.

(4) That the said 66,601 gallons of fuel oil were withdrawn from bonded warehouse under vessel supply entry 20085, and were laden aboard the steamship "Caracas" for use as fuel supplies on January 27, 1938.

(5) That the said steamship "Caracas" while at the port of New York and previous to receiving said fuel oil was sold by the Grace Line to the Alaska Steamship Company.

(6) That the Alaska Steamship Company purchased said steamship for the purpose of transporting her to Seattle, Washington *to enter into trade between the United States and Alaska.*

(7) That the "Caracas" made the voyage from New York to Seattle, in ballast without cargo or passengers, under her own power and that the said 66,601 gallons of fuel oil were used as fuel between New York and Seattle.

(8) That the Collector's letter of June 21, 1938, shall be received *as evidence as part of the record.*

(9) That the Collector of the port of New York assessed duty upon said 66,601 gallons of fuel oil at the rate of ½ of 1 cent per gallon under Section 601 (c) (4) of the Revenue Act of 1932.

(10) That the Collector of the port of New York refused to allow the exemption from said tax provided in Section 630 of the said Revenue Act.of 1932 as amended June 16, 1933. [Italics supplied.]

We quote from the report of the collector, dated June 21, 1938, in answer to appellant's protest against the assessment of the internal revenue tax, referred to in item 8 of the quoted stipulation as "the Collector's letter," as follows:

The *Caracas* was sold by the Grace Line to the Alaska S. S. Co., title apparently passing at New York. The new owners sent *the ship in ballast to the Pacific Coast for fitting out and to begin from there a trade with Alaska.* In other words it was formerly "actually engaged" in trade and may well be again but when it left here after sale it was not engaged in trade at all. It could have been broken for scrap or made into a floating hotel or tied up to a wharf upon arrival on the Pacific Coast so far as its status on the delivery trip is concerned. [Italics ours.]

It will be observed that the *Caracas* was sold by the Grace Line to the Alaska Steamship Company while it was in the port of New York and under United States registry. In what trade it had been engaged prior to its sale does not appear from the record.

It appears that the *Caracas* made the voyage from New York to Seattle under her own power without cargo or passengers; that the 66,601 gallons of fuel oil were used as fuel between those two ports; that the Alaska Steamship Co. purchased the *Caracas* for the "purpose of transporting her to Seattle, Washington *to enter into trade* between the United States and Alaska"; and that, as appears from the collector's report, the ship was sent to the Pacific Coast *"for fitting out and to begin from there a trade with Alaska."* [Italics ours.]

On the record presented, the trial court held that the *Caracas* was not actually engaged in trade while en route between Atlantic and Pacific ports of the United States. In so holding, the court considered the various provisions hereinbefore quoted, distinguished the facts in the instant case from those in the case of *Standard Oil Company of Louisiana* v. *United States*, 3 Cust. Ct. 39, C. D. 199 (relied upon by counsel for appellant), reviewed the decision in the case of *Standard Oil Company of New Jersey* v. *United States*, 29 C. C. P. A. (Customs) 82, C. A. D. 174 (which cases will be hereinafter referred to), and in the course of its opinion, said:

If Congress had in mind the common, ordinary meaning of the term "foreign trade" as used in section 309 [which in the *Standard Oil Company of New Jersey* case, *supra*, was held to be "the commercial interchange of commodities from different countries"], likewise in referring to trade between the Atlantic and Pacific ports of the United States, or between the United States and any of its possessions, it used the term *trade* as applied to such ports in its ordinary meaning. Consequently vessels entitled to receive oil exempt from the excise tax are such as are actually engaged in trade as above defined. Clearly the vessel *Caracas* at the time the oil was received on board was not actually engaged in any such undertaking. The use of the oil was for no other purpose than the delivery of the vessel from one purchaser to another. As stated in the *Standard Oil Co. of New*

*Jersey* case, *supra*," The vessel itself  *  *  *  was the article or merchandise" which necessitated the voyage from the east to the west coast. [Italics quoted.]

With reference to the provisions of section 464 (c) (4) of the customs regulations, *supra*, the court stated, in substance, that the voyage of the *Caracas* from New York to Seattle in ballast was directly covered thereby, but that those provisions were broader than the provisions of sections 309 (a) and 630, *supra*, and, therefore, were not consistent with the latter provisions.

It is contended here by counsel for appellant that the trial court was in error in stating that the oil here in question was used "for no other purpose than the delivery of the vessel from one purchaser to another."

Counsel for appellant are clearly right in that contention. We find nothing in the facts of record to warrant the finding of the trial court that the fuel oil in question was used for the purpose of delivering the *Caracas* from the Grace Line to the Alaska Steamship Company.

Counsel for appellant further contend that the fuel oil in question is entitled to be exempt from the tax assessed against it by virtue of the provisions of article 464 (c) (4) of the customs regulations, *supra*; that those provisions are in conformity with the provisions of sections 309 (a) and 630, *supra*; that they are, therefore, valid; that the purpose of the provisions of sections 309 (a) and 630, *supra*, is to exempt from the tax all fuel oil supplied to vessels "which, because of the trade in which they are engaged, are in a position to obtain tax free fuel in foreign ports"; and that as the *Caracas* could have obtained fuel oil tax free in Cuba or the Canal Zone on her voyage from New York to Seattle, and as the voyage was necessary in order to carry out the purpose for which the vessel was purchased, namely, to engage in trade between ports of the Pacific Coast and Alaska, the tax was illegally assessed by the collector. In support of their contentions, counsel rely upon the legislative history of section 630, *supra*.

The legislative history of the provisions of section 630, *supra*, was considered in the case of *Standard Oil Company of New Jersey* v. *United States*, *supra*, where it was held that oil used as fuel supplies on the steamship *Leviathan* on its voyage in ballast from New York City to Rosyth, Scotland, where the ship was broken up and reduced to scrap material, was subject to the tax of ½ of 1 cent per gallon under section 601 (c) (4), *supra*, because the ship was not actually engaged in foreign trade. With reference to the legislative history of section 630, *supra*, the court stated that the purpose of the provisions of that section was, as appeared from the discussion on the floor of the Senate, to further business in this country by permitting owners of vessels "which were employed in the capacities named" in section 630, *supra*,

to purchase fuel oil in the United States without the payment of the tax.

The purpose of the pertinent provisions of section 630, *supra*, is clear. Under those provisions fuel oil used as supplies is exempt from the tax only in the event the vessel on which it is used is "actually engaged in * * * trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions," and the customs officials and the courts may not enlarge upon such provisions.

The question for determination, therefore, is: Was the *Caracas* on its voyage from the port of New York to the port of Seattle actually engaged in trade between those ports or between the United States and Alaska?

It clearly appears from the quoted stipulation that the *Caracas* was purchased from the Grace Line by the Alaska Steamship Company for the purpose of transporting her in ballast from New York to Seattle, there to have her outfitted and made suitable "to enter into" trade between the United States and Alaska. In view of the fact that the *Caracas* was transported in ballast from the port of New York to the port of Seattle where she was to be outfitted and made suitable "to enter into" trade between the United States and Alaska she was not actually engaged in trade between the ports of New York and Seattle when the oil in question was consumed, nor was she actually engaged in trade between the United States and Alaska.

Counsel for appellant argue, however, that, in view of the holding of the United States Customs Court in the case of *Standard Oil Company of Louisiana* v. *United States, supra,* the *Caracas* was actually engaged in trade between the Atlantic and Pacific ports of the United States.

It appears from the court's decision in the *Standard Oil Company of Louisiana* case, *supra,* that the steamship *Delmundo* operated on a regular schedule between New Orleans and South America; that the scheduled voyages began and ended at New Orleans; that in accordance with its schedule the ship proceeded from New Orleans to certain Gulf ports where cargo was taken on board to be transported to South America; that she returned to New Orleans where more cargo was taken on board; that she then proceeded to South American ports where the cargo was discharged; that cargo was then taken on board at certain South American ports to be discharged at New Orleans; that, on January 9, 1936, the *Delmundo* arrived at New Orleans from Brazil carrying a general cargo; that the cargo was discharged at New Orleans and the vessel underwent certain repairs and took on the fuel there in question; that four days later, January 13, the vessel left New Orleans for Pensacola in ballast where cargo was taken on board to be transported to South America; and that thereafter she sailed for

Buenos Aires via Mobile, New Orleans, Rio de Janeiro, Santos, and Montevideo.

The oil used as fuel supplies on the *Delmundo* was assessed with a tax of ½ of 1 cent per gallon under the provisions of section 601 (c) (4), *supra*.

In holding that the oil used as fuel supplies on the *Delmundo* was exempt from the tax assessed against it, the court stated that the lading of cargo destined for South America at Pensacola was not coastwise trade but foreign trade, and that since it was necessary for the vessel to proceed from New Orleans to Pensacola to pick up cargo on her regular schedule, the voyage from New Orleans to Pensacola in ballast should be considered as part of the operation of the vessel in foreign trade.

The facts in the *Standard Oil Company of Louisiana* case, *supra*, are clearly distinguishable from the facts in the instant case. In that case it was necessary for the *Delmundo* to proceed from New Orleans to Pensacola and back to New Orleans in order to pick up cargo to be transported to ports in South America. In the instant case, however, the *Caracas* did not pick up any cargo between New York and Seattle, nor was it the intention of the Alaska Steamship Company that she do so. On the contrary, the purpose of that company was to transport the vessel from New York to Seattle for the purpose of having her outfitted and put in suitable condition "to enter into trade between the United States and Alaska."

It does not appear of record that the *Caracas* was ever actually engaged in trade between the United States and Alaska, nor is there anything of record to establish that she was ever engaged in trade after she left the port of New York.

Counsel for appellant argue, however, that as the *Caracas* departed in ballast from the port of New York and proceeded directly to a port—Seattle—on the opposite coast of the United States, the oil is exempt from the tax assessed against it in accordance with article 464 (c) (4) of the customs regulations, *supra*.

It is true, as argued by counsel for appellant, that article 464 (c) (4), *supra*, provides that fuel oil used as supplies on a vessel departing in ballast from the port at which the oil was withdrawn and proceeding directly to a port on the opposite coast of the United States is exempt from the tax of ½ of 1 cent per gallon. However, we are of opinion that the provisions of article 464 (c) (4), *supra*, are not in conformity with the provisions of sections 309 (a) and 630, *supra*, and are, therefore, invalid.

That the Commissioner of Customs and the Secretary of the Treasury recognized that the quoted provisions of article 464 (c) (4) of the customs regulations, *supra*, were invalid, is evidenced by the

fact that on February 26, 1943, the article in question was amended (T. D. 50822, 78 Treas. Dec. 229) so as to read, in part, as follows:

Departing in ballast from the port at which the withdrawal [of the fuel oil] is made for * * * a port on the opposite coast of the United States * * * *for the purpose of lading passengers or cargo at the port of destination for transportation in a class of trade specified in section 309 (a), Tariff Act of 1930, as amended,* for which class of trade the vessel is suitable and seaworthy at the time of leaving the port of withdrawal and from which it is not diverted prior to such lading. [Italics not quoted.]

At the time of the oral arguments in this court counsel for appellant contended that, as the *Caracas* was purchased by the Alaska Steamship Company for the purpose of transporting merchandise from the United States to Alaska, the voyage from New York to Seattle in ballast should be regarded as a part of a continuous trip from New York to Alaska, and that the oil in controversy should not be deprived of exemption from the tax merely because the *Caracas* made the voyage from New York to Seattle in ballast.

We are unable to accept the views of counsel for appellant that the voyage of the *Caracas* from New York to Seattle should be regarded as a continuous trip from New York to Alaska for two reasons; namely, first, they are directly contrary to the stipulated facts in the case, and, second, as hereinbefore noted, there is no evidence whatsoever of record that the *Caracas* was ever actually engaged in trade between the United States and Alaska.

In neither of the decisions in the cases of the *Standard Oil Company of Louisiana* and the *Standard Oil Company of New Jersey, supra,* was it held that a ship was not actually engaged in trade merely because it left port in ballast, nor do we intend to be understood as suggesting the propriety of such a holding in the instant case.

In view of the fact that the steamship *Caracas* was not actually engaged in trade on its voyage from the port of New York to the port of Seattle, on which voyage the oil here involved was consumed, but was transported to the port of Seattle for the purpose of being outfitted and put in suitable condition "to enter into trade between the United States and Alaska," we hold, as did the trial court, that the oil in question is not exempt from the internal revenue tax of ½ of 1 cent per gallon.

The judgment is *affirmed.*

O'CONNELL, Judge, dissenting:

On oral argument, counsel stated that this proceeding was instituted mainly for the purpose of establishing a precedent for the administrative use of the customs service, the oil industry and the shipping industry insofar as it is engaged in other than the American coastwise trade.

The question of law upon which the parties seek a decision is based upon a transaction in which a ship of a regular line actually engaged

in trade between ports of the United States and ports of South America is sold at the port of New York by the line in question to another regular line engaged in trade between ports of the United States and Alaska and transported by the new owner in ballast from New York to Seattle to engage from there in service of the regular line between ports of the United States and Alaska.

En route from New York to Seattle the ship used fuel oil laden at New York as ships' supplies, which is tax exempt under the law if the ship in being transported from New York to Seattle by the new owner was actually engaged in trade either between ports of the Atlantic and Pacific or between a port of the United States and one of its possessions.

The difficulty in reaching a decision on the foregoing facts is that the stipulation entered into between the parties supplemented by a letter from the collector of customs at New York leaves some of such facts to conjecture, and while this oversight is to be deplored, nevertheless the overlooked facts must be dismissed from consideration.

However, it is definitely disclosed by the stipulation that the *S. S. Caracas* was sold by the Grace Line to the Alaska Steamship Company and was transported in ballast from the port of New York to Seattle "to enter into trade between the United States and Alaska." The *Caracas* made the voyage under her own power and the oil laden as supplies for the voyage, amounting to 66,601 gallons, was used as fuel en route between New York and Seattle.

To the above facts, may be added a contribution from the letter of the collector of customs, which is set forth in the majority opinion, that the *new owners* sent the ship in ballast to the Pacific Coast *for fitting out*, and that the *Caracas* prior to her transfer to the Alaska Steamship Company was *actually engaged in trade*.

That the aforesaid letter of the collector of customs is a self-serving declaration is disclosed by the fact that the letter is written by the official who assessed the tax, who is employed by appellee, and who naturally has an interest in sustaining his position herein. By his statement with reference to the *Caracas* that "when it left here after sale it was not engaged in trade at all," he is in effect rendering the decision that the court is called upon to make in this case, and to support his legal conclusion that the vessel was not engaged in trade at all, he states that "It could have been broken for scrap or made into a floating hotel or tied up to a wharf upon arrival on the Pacific Coast so far as its status on the delivery trip is concerned."

The collector's statement that she could be "made into a floating hotel" is worthy of note in a case where the facts relative to the condition of the vessel are as meager as they are here. The statement warrants an inference, however, that the vessel was not in a state of

disrepair or unpresentable or that its facilities and appointments were unsuitable for occupation as a hotel. Furthermore, as stated by the collector, prior to her sale, the ship had been *actually engaged in trade*.

The collector's statement that the *Caracas* was sent to the Pacific Coast "for fitting out," was interpreted by the trial court to mean that the fuel oil was laden on board the *Caracas* "for the *delivery of itself* from the east to west coast, where it was to be *refitted so as to become able* to enter actual trade between the United States and one of its possessions." [Italics mine.]

Based upon the aforesaid statement of the collector, that the *Caracas* was transported to Seattle "for fitting out and to begin from there a trade with Alaska," the majority opinion concludes that the ship was transported there "to have her outfitted *and made suitable* to enter into trade between the United States and Alaska," also that the *Caracas* "was transported to the port of Seattle for the purpose of being outfitted *and put in a suitable condition* to enter into trade between the United States and Alaska." [Italics mine.]

There is not a single word in the record that the *Caracas* was not a first class ship and was not in first class seaworthy condition at all times, and the "outfitting" referred to in the collector's letter, so far as the record shows, may well have meant, for example, the taking on of a pilot, or deckhands, or a crew familiar with the navigation of the Alaskan ports and waters, or the loading of cots for soldiers stationed in Alaska and engaged there in the military service of the United States. On the contrary, prior to her sale, as stated by the collector, the *Caracas* was "actually engaged in trade."

In deciding the question relative to the issue in the case at bar, the courts usually cite two well-known judicial precedents, as is done in the majority opinion and in the opinion of the trial court, namely, *Standard Oil Company of New Jersey* v. *United States*, 29 C. C. P. A. (Customs) 82, C. A. D. 174, and *Standard Oil Company of Louisiana* v. *United States*, 3 Cust. Ct. 39, C. D. 199.

The first case deals with the *Leviathan* which was owned by an English concern and transported by it in ballast from New York to Scotland to be broken up for scrap. The other case deals with the *S. S. Delmundo* which was engaged in trade between New Orleans and South America and was transported in ballast from New Orleans to Pensacola to begin from there the dispatch of cargo destined for ports in South America.

The courts held that the *Leviathan* in her voyage from New York to Scotland, in ballast, was not actually engaged in foreign trade and therefore was subject to the tax, while in the other case, the court held that the *Delmundo* in her voyage, in ballast, from New Orleans to Pensacola was actually engaged in foreign trade and therefore was exempt from the tax.

The conclusion reached by the court below and in the decision of the majority herein disclose that both courts have associated the voyage of the *Caracas* with the circumstances associated with the voyage of the *Leviathan* and have rejected the idea that the voyage of the *Caracas* is to be classified with the circumstances relative to the voyage of the *Delmundo.*

The trial and appellate courts in the case at bar have failed to note the difference between the voyage of the *Leviathan* from New York to Scotland and the voyage of the *Caracas* from New York to Seattle.

The *Leviathan* was sent to Scotland to be dismantled and end a career, the *Caracas* was sent to Seattle to be outfitted and begin a career. The *Leviathan* was transported to the scrap heap, the *Caracas* was transported to work. On the other hand, the voyage of the *Caracas* falls squarely within the facts and interpretation of law as enunciated in the *Delmundo* case.

The majority opinion states that there is no evidence that the *Caracas* ever engaged in the Alaskan trade or any other trade after she reached Seattle. It seems to me that the court is authorized to take judicial notice of the fact that the executives of an important and regularly operated line in the American shipping industry are not likely to invest a huge sum of money in the purchase and transfer of a seaworthy ship from the Atlantic to the Pacific for the purpose of junking it. Yet that is the precise judicial interpretation of appellant's action in the decision of this and the lower court, and in sending the *Caracas* to the scrap heap they send along with her the regulation of the customs service which for years has been the basis of the administrative practice not only of the customs service of the United States, but also of the shipping and oil industries.

In the process of reaching its decision, the lower court went on the theory, as stated in the concluding paragraph of its opinion, that "the *Caracas* took on the fuel for purposes other than as an incident in trade between the United States and any of its possessions, to wit, *for the delivery of itself* from the east to the west coast." [Italics mine.] The statement that the *Caracas* delivered itself from the east to the west coast violates the dictates of common sense, but it represents the theory upon which the Alaska Steamship Company was deprived by the court of any connection with the transportation of the vessel from the east to the west coast, and it also broke the continuity of the occupation in which the *Caracas* was engaged. Furthermore, the implication to be drawn from the opinions of both courts in this case is that the *Caracas* would have been *actually engaged in trade* had she loaded any cargo whatever, say a bunch of bananas, or a box of cigars, en route from New York to Seattle.

A vessel is actually engaged in trade under the statutes when she is making her voyage in the dispatch of her owner's business. A vessel

is not actually engaged in trade when she is not occupied upon a voyage in the dispatch of her owner's business, but is employed, say, as a floating hotel, or has no occupation whatever and is tied to a wharf, is in dry dock, or is indefinitely at anchor awaiting a future disposition, such as in the case of the recent fleet of worn-out destroyers, or the "phantom fleet" of the Shipping Board which was anchored in the waters of the Hudson subsequent to World War I.

There is no reason to conclude from the record in this case that the *Caracas* during the period involved was not continuously engaged in trade, and whether such trade was trade between the ports of the Atlantic and Pacific, or between the ports of the United States and Alaska, is immaterial, as the fuel oil used in either class of trade is exempt from tax under the provisions of the statutes.

It seems to me that this court is nullifying the statute through a judicial definition of the word "trade," as the statute was heretofore nullified by a judicial definition of the word "export." *Swan and Finch Company* v. *United States*, 190 U. S. 143. After the decision in the *Swan* case, Congress revived the legislation by enacting for the benefit of the courts the definition of the word "export."

In devising legislation to cover a wide and active field of industrial endeavor, it is impossible for Congress to enumerate the multitudinous instances in which the legislation is to be applied and to set forth in minute detail the precise situations in which the law is applicable. That Congress has not specifically enumerated the precise set of facts herein as coming within the express provision of the statutes, is no reason for reversing or restricting the operation of the law.

I dissent from the decision which has been reached in this case for the reasons hereinbefore stated, and for the reasons stated in the recent decision of this court in *United States* v. *Gulf Oil Corporation*, 32 C. C. P. A. (Customs) 133, C. A. D. 297, Customs Appeal No. 4482, decided January 4, 1945.