United States *v.* Esso Export Corporation (No. 4789)[1]

United States Court of Customs and Patent Appeals, June 24, 1954

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon* and *William J. Vitale*, special attorneys, of counsel), for the United States.
*Sharretts, Paley & Carter* (*Amos B. Sharretts* and *Joseph F. Donohue* of counsel) for appellee.

[Oral argument February 2, 1954, by Mr. Vitale and Mr. Donohue]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

Here the Government appeals from a judgment of the United States Customs Court, Third Division, rendered pursuant to its decision, C. D. 1535, sustaining the protests of appellee against the assessment by the Collector of Customs of an internal revenue tax on 171,616

[1] C. A. D. 569

gallons of bonded fuel oil withdrawn as supplies for use [on the *SS George Washington*. One protest directed against the tax assessment and another against the liquidation were consolidated for trial.

The tax was levied pursuant to the provisions of section 3422 of the Internal Revenue Code, as amended, at ¼¢ per gallon. The protest claimed that the oil, when used as fuel supplies, was exempt from the tax under the provisions of section 309 (a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C., sec. 1309 (a)) and section 10.59 of the Customs Regulations of 1943, as amended, which, so far as pertinent, read:

SEC. 309. SUPPLIES FOR CERTAIN VESSELS AND AIRCRAFT.

(a) Exemption from customs duties and internal-revenue tax.—Articles of foreign or domestic manufacture or production may, under such regulations as the Secretary of the Treasury may prescribe, be withdrawn from bonded warehouses, * * * free of duty or internal-revenue tax for supplies (not including equipment) of vessels * * *, actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions, * * * .

Section 10.59 of the Customs Regulations of 1943, as amended:

WITHDRAWAL OF SUPPLIES FOR VESSELS

10.59. Exemption from customs duties and internal-revenue tax.—(a) A vessel shall not be considered to be actually engaged in the foreign trade, or in trade between the Atlantic and Pacific ports of the United States, or between the United States and its possessions, as the case may be, for the purpose of withdrawing supplies from bonded warehouses free of duty and internal-revenue tax pursuant to section 309 (a), Tariff Act of 1930, as amended, unless it is—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(4) Departing in ballast from the port at which the withdrawal is made for a foreign port, a port on the opposite coast of the United States, a port in one of the possessions of the United States (or if the port of withdrawal is in a possession of the United States, for a foreign port, the United States, or another possession of the United States) for the purpose of lading passengers or cargo at the port of destination for transportation in a class of trade specified in section 309 (a), Tariff Act of 1930, as amended, for which class of trade the vessel is suitable and seaworthy at the time of leaving the port of withdrawal and from which it is not diverted prior to such lading.

\*　　\*　　\*　　\*　　\*　　\*　　\*

As stipulated by the parties, the facts are

1. That 4,620,000 gallons of fuel oil were imported into the United States at the port of New York and entered into bonded warehouse under Warehouse Bond No. 12825 dated February 13, 1948, from which 171,616 gallons were later withdrawn and laden as vessel supplies aboard the steamship GEORGE WASHINGTON;

2. That the Alaska Transportation Company purchased the steamship GEORGE WASHINGTON from the United States Maritime Commission;

3. That, before the said 171,616 gallons of fuel oil the subject of these protests were laden aboard the steamship GEORGE WASHINGTON and while said vessel was laid up at Tompkins Cove, New York, title to the said vessel was

transferred from the United States Maritime Commission to the Alaska Transportation Company;

4. That the steamship GEORGE WASHINGTON was registered in the United States under marine document P. R. No. 305, ownership in the Alaska Transportation Company, home port at New York;

5. That thereafter on February 16, 1948 the said 171,616 gallons of fuel oil previously imported on Warehouse Bond No. 12825 were withdrawn from bonded warehouse under Vessel Supply entry 5607, and were laden aboard the said steamship for use as vessel supplies;

6. That the said vessel departed in ballast without passengers from New York on February 19, 1948 without clearance;

7. That the said vessel arrived at Seattle, Washington, on March 11, 1948;

8. That the said 171,616 gallons of fuel oil laden at the Port of New York for fuel supplies aboard said vessel were consumed as fuel supplies on the aforesaid voyage to Seattle where said vessel was converted and refitted to make her suitable for the Alaskan trade;

9. That on May 28, 1948 the aforesaid marine document P. R. 305 was surrendered and the aforesaid vessel was registered in Seattle to change her home port to Seattle, Washington, and to change her tonnage.

10. That on May 31, 1948 the steamship GEORGE WASHINGTON sailed from Seattle, Washington for her next scheduled port of arrival in Alaska in the Alaskan trade with passengers, cargo, ships stores and supplies laden aboard said vessel at Seattle, and that the vessel subsequently arrived at an Alaskan port;

11. That all pertinent Customs Regulations required for the voyage aforesaid between New York and Alaskan ports were complied with;

\*　　\*　　\*　　\*　　\*　　\*　　\*

The Collector of Customs held that the *George Washington* was not moving in trade nor intending to move in a trade that would entitle the owner or operator of the vessel to withdraw the oil in issue free of duty under sections 309 (a) and 10.59, *supra,* reference being made in his memorandum to Exhibit IV attached to the official papers in this case.[1]

The trial court's reversal of the holding of the collector was seemingly based on the decision in *Asiatic Petroleum Corp.* v. *United States,* 36 C. C. P. A. (Customs) 9, C. A. D. 389. However, there it was clearly agreed that the ship involved was *actually engaged* in a trade specified in the statute. Here that is the precise issue to be determined.

One of the cases discussed by the trial court and, in our opinion, the one most analogous to that at bar is *Standard Oil Company of New*

---

[1] Letter of January 18, 1949, from Alaska Transportation Company to Esso Export Corporation (appellee herein).

\*　　\*　　\*　　\*　　\*　　\*　　\*

1. The S/S George Washington arrived March 11, 1948 in Seattle, Wash. from New York. She immediately started conversion and repairs. She completed conversion and repairs on May 28, 1948. Voyage 1 commenced May 28, 1948 and the vessel stored, loaded cargo and passengers, sailing May 31, 1948 for Alaskan ports only.

2. The S/S George Washington, prior to departure from New York for Seattle, was unsuitable for the Puget Sound-Alaska trade.

3. The conversion of the S/S George Washington was necessary to make her suitable for the Puget Sound-Alaska trade.

\*　　\*　　\*　　\*　　\*　　\*　　\*

*Jersey* v. *United States*, 32 C. C. P. A. (Customs) 190, C. A. D. 306. The material facts there are identical with those here except that in the cited case there was no proof that the *SS Caracas* engaged in trade between the United States and Alaska subsequent to her arrival at Seattle. The similarity of facts in the two cases is seen from the following quoted matter from the cited case:

> The purpose of the pertinent provisions of section 630, *supra*, [Sec. 309, *supra*] is clear. Under those provisions fuel oil used as supplies is exempt from the tax only in the event the vessel on which it is used is "actually engaged in * * * trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions," and the customs officials and the courts may not enlarge upon such provisions.
>
> The question for determination, therefore, is: Was the *Caracas* on its voyage from the port of New York to the port of Seattle actually engaged in trade between those ports or between the United States and Alaska?
>
> It clearly appears from the quoted stipulation that the *Caracas* was purchased from the Grace Line by the Alaska Steamship Company for the purpose of transporting her in ballast from New York to Seattle, there to have her outfitted and made suitable "to enter into" trade between the United States and Alaska. In view of the fact that the *Caracas* was transported in ballast from the port of New York to the port of Seattle where she was to be outfitted and made suitable "to enter into" trade between the United States and Alaska she was not actually engaged in trade between the ports of New York and Seattle when the oil in question was consumed, nor was she actually engaged in trade between the United States and Alaska.

Appellee contends that proof of subsequent engagement of the *George Washington* in the Alaskan trade brings this case squarely within the facts and interpretations of law as enunciated in the case of *Standard Oil Co. of Louisiana* v. *United States*, 3 Cust. Ct. 39, C. D. 199, adding that it was "cited with approval" in the *Standard Oil of New Jersey* case, *supra*. However, an examination of that case leaves us with a somewhat different view. In the latter case it was said

> The facts in the *Standard Oil Company of Louisiana* case, *supra*, *are clearly distinguishable from the facts in the instant case*. In that case it was necessary for the *Delmundo* to proceed from New Orleans to Pensacola and back to New Orleans in order to pick up cargo to be transported to ports in South America. In the instant case, however, the *Caracas* did not pick up any cargo between New York and Seattle, nor was it the intention of the Alaska Steamship Company that she do so. On the contrary, the purpose of that company was to transport the vessel from New York to Seattle for the purpose of having her outfitted and put in suitable condition "to enter into trade between the United States and Alaska." (Italics ours.)

While we are in complete agreement with the appellee that the trip from New York was "a necessary activity to enable it to transport passengers and cargo from the United States to Alaska," we do not agree that the ship "was thereby actually engaged in trade within the meaning of section 309 (a) of the Tariff Act of 1930, as amended, * * *" as urged.

The tax in dispute was levied on the oil used in transporting the *George Washington* from New York to Seattle—not from Seattle to Alaska. The question, therefore, is whether during that particular period of time the ship was *actually engaged* in trade as contemplated by section 309 (a), *supra*. We think not. The record shows that the ship was sold in New York to its new owners. She left New York in ballast, without cargo or passengers, and during the trip to Seattle engaged in no trade or commerce as we understand the meaning of those terms. Obviously she was not on a regular schedule as was the *Delmundo* in the *Standard Oil of Louisiana* case, *supra*. Appellee states in its brief that "The only difference between the situation of the *Delmundo* and that of the *George Washington* is that the *Delmundo* had previously established a regular schedule, while the *George Washington* was making an initial voyage." The term "initial voyage" suggests additional trips between New York and Seattle but in our view the facts here clearly point to just the opposite conclusion.

As noted in the stipulation, the *George Washington* arrived in Seattle March 11 and remained until her departure for Alaska May 31, 1948. During that time her registry was changed, her tonnage was changed, she was refitted, and her status was converted to one of trade between the United States and Alaska. We do not believe those facts support appellee's position that the trip from New York to Alaska was "continuous" in the sense urged by appellee. Presumably her later activities qualified her for tax exemption but we do not believe Congress intended to say, nor that the decisions of this or any other court support the view that during the time of the trip from New York to Seattle the *George Washington* was actually engaged in trade as provided in section 309 (a), *supra*.

The judgment appealed from is *reversed* and the cause *remanded* for further proceedings consistent with the views herein expressed.

Judge O'CONNELL dissents and in so doing asserts the view that the judgment in this case should be affirmed for the reasons advanced in the decision of the court below.

GARRETT, C. J., because of illness, did not participate in the decision of this case.