(C. D. 858)

STANDARD OIL CO. OF NEW JERSEY *v.* UNITED STATES

United States Customs Court, Third Division·

(Decided June 24, 1944)

*Sharretts & Hillis* (*Arthur L. Tallman* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*William J. Vitale* and *Richard H. Welsh,* special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: The issue raised· in this case is the legality of the collector's assessment of an internal revenue tax of one-half of 1 cent per gallon upon 66,601 gallons of fuel oil under section 601 (c) (4) of the Revenue Act of 1932 upon withdrawal of the same from warehouse as fuel supplies on the S. S. *Caracas.* The plaintiff claims that the fuel oil is exempt from tax by virtue of section 309 (a) of the Tariff Act of 1930 and section 630 of the Revenue Act of 1932, as amended (T. D. 46522).

Section 309 of the Tariff Act of 1930 provides as follows:

SEC. 309. SUPPLIES FOR CERTAIN VESSELS.

(a) EXEMPTION FROM CUSTOMS DUTIES AND INTERNAL-REVENUE TAX.— *Articles of foreign* or domestic manufacture or *production may,* under such regulations as the Secretary of the Treasury may prescribe, *be withdrawn from bonded warehouses* or bonded manufacturing warehouses *free of* duty or *internal-revenue tax*

(1)

for supplies (not including equipment) of vessels of war, in ports of the United States, of any nation which may reciprocate such privilege toward the vessels of war of the United States in its ports, or *for supplies (not including equipment) of vessels of the United States* employed in the fisheries or in the whaling business, or *actually engaged in* foreign trade or *trade between the Atlantic and Pacific ports of the United States* or between the United States and any of its possessions, but no such article shall be landed at any port or place in the United States or in any of its possessions. [Italics not quoted.]

The Revenue Act of 1932 provides as follows:

SEC. 601. EXCISE TAXES ON CERTAIN ARTICLES.

\*        \*        \*        \*        \*        \*        \*

(c) There is hereby imposed upon the following articles sold in the United States by the manufacturer or producer, or imported into the United States, a tax at the rates hereinafter set forth, to be paid by the manufacturer, producer, or importer:

\*        \*        \*        \*        \*        \*        \*

(4) Crude petroleum, ½ cent per gallon; fuel oil derived from petroleum, \*   \*   \* ½ cent per gallon; \*   \*   \*. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles.

SEC. 630. [AS AMENDED, T. D. 46522.] EXEMPTION FROM TAX OF CERTAIN SUPPLIES FOR VESSELS.

Under regulations prescribed by the Commissioner, with the approval of the Secretary, no tax under this title shall be imposed upon any article sold for use as *fuel supplies*, ships' stores, sea stores, or legitimate equipment *on* vessels of war of the United States or of any foreign nation, *vessels* employed in the fisheries or in the whaling business, or *actually engaged in* foreign trade or *trade between the Atlantic and Pacific ports of the United States* or between the United States and any of its possessions. \*   \*   \*. [Italics not quoted.]

The Customs Regulations of 1937 provide as follows:

Art. 464. \*   \*   \* (c)—A vessel is not considered to be actually engaged \*   \*   \* in trade between the Atlantic and Pacific ports of the United States, \*   \*   \* unless it is—

(1) Operating on a regular schedule in a class of trade which entitles it to the privilege;

(2) Actually transporting passengers or merchandise to or from \*   \*   \* a port on the opposite coast of the United States, \*   \*   \* :

\*        \*        \*        \*        \*        \*        \*

(4) Departing in ballast from the port at which the withdrawal is made directly for a \*   \*   \* port on the opposite coast of the United States, \*   \*   \*.

At the trial of this case the parties hereto stipulated and agreed to the following facts:

(1) That the 66,601 gallons of fuel oil covered by the above protest was [were] imported into the United States at the port of New York, and entered into bonded warehouse under Warehouse Bond No. 103864 of January 24, 1938.

(2) That the said 66,601 gallons of fuel oil were sold by the Standard Oil Co. of New Jersey for use as fuel supplies on the S. S. *Caracas.*

(3) That at the time of said sale the S. S. *Caracas* was under United States registry, and was at the port of New York.

(4) That the said 66,601 gallons of fuel oil were withdrawn from bonded ware-

house under vessel supply entry 20085, and were laden aboard the said S. S. *Caracas* for use as fuel supplies on January 27, 1938.

(5) That the said S. S. *Caracas* while at the port of New York and previous to receiving said fuel oil was sold by the Grace Line to the Alaska Steamship Co.

(6) That the Alaska Steamship Co. purchased said steamship for the purpose of transporting her to Seattle, Wash., to enter into trade between the United States and Alaska.

(7) That the *Caracas* made the voyage from New York to Seattle, in ballast without cargo or passengers, under her own power and that the said 66,601 gallons of fuel oil were used as fuel between New York and Seattle.

(8) That the collector's letter of June 21, 1938, shall be received in evidence as part of the record. .

(9) That the collector of the port of New York assessed duty upon said 66,601 gallons of fuel oil at the rate of ½ of 1 cent per gallon under section 601 (c) (4) of the Revenue Act of 1932.

(10) That the collector of the port of New York refused to allow the exemption from said tax provided in section 630 of the said Revenue Act of 1932 as amended June 16, 1933.

(11) That the plaintiff be granted 30 days for the filing of a brief and that the defendant be granted 30 days thereafter for the filing of a reply brief and that said protest may be deemed submitted on this stipulation.

The collector's letter of June 21, 1938, above referred to as a part of the evidence in the case, reads as follows:

This protest, although directed against our liquidation of March 3, 1938, is actually against the charge against the warehouse bond upon the withdrawal of 66,601 gallons of oil on January 27, 1938. The charge was for an internal revenue tax of ½ of 1 cent per gallon, as correctly liquidated and as paid March 4, 1938. If the *Caracas* was at time of clearance actually engaged in trade within the meaning of section 630 of the Revenue Act of 1932, the internal revenue tax should not have been assessed upon the oil laden as vessel supplies under the conditionally free permit of January 27, 1938, #VS 20085 (attached).

The *Caracas* was sold by the Grace Line to the Alaska Steamship Co., title apparently passing at New York. The new owners sent the ship in ballast to the Pacific coast for fitting out and to begin from there a trade with Alaska. In other words it was formerly "actually engaged in" trade and may well be again but when it left here after sale it was not engaged in trade at all. It could have been broken for scrap or made into a floating hotel or tied up to a wharf upon arrival on the Pacific coast so far as its status on the delivery trip is concerned.

The protest was filed within 60 days of the withdrawal, the "demand" for tax and the liquidation.

The plaintiff contends that although the *Caracas* was not carrying merchandise or passengers, her navigation from New York to Seattle was a necessary part of a class of trade within the meaning of section 309 (a), *supra,* and section 630, *supra;* and that the regulations, article 464, subdivision (c) (4), *supra,* specifically provide that vessels actually engaged in trade between the Atlantic and Pacific ports of the United States include vessels "departing in ballast from the port at which the withdrawal is made * * * directly for a * * * port on the opposite coast of the United States,

* * *." The plaintiff relies upon the case of *Standard Oil Co. of Louisiana* v. *United States*, 3 Cust. Ct. 39, C. D. 199.

The Government contends that the *Caracas* was not actually engaged in trade between the Atlantic and Pacific ports within the meaning of section 309 (a), *supra*, or section 630, *supra*, and that the situation in the foregoing decision (C. D. 199) is easily distinguishable, and relies upon the case of *Standard Oil Co. of New Jersey* v. *United States*, 29 C. C. P. A. 82, C. A. D. 174.

The question here is whether or not the *Caracas* may be regarded as "actually engaged in * * * trade between the Atlantic and Pacific ports of the United States," when proceeding *in ballast* from New York to Seattle where it was to be fitted out and to begin from there a trade with Alaska.

Section 309, *supra*, and section 601, *supra*, specify that no tax shall be imposed upon a vessel actually engaged in trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions. The regulations, *supra*, specify that a vessel is to be considered actually engaged in trade, when it is operating on a regular schedule in the proper class of trade, or actually transporting passengers or merchandise, or departing in ballast from the port at which the withdrawal is made directly for a port on the opposite coast of the United States. A vessel is "in ballast" when she carries ballast only. (See Funk & Wagnalls Dictionary.) Apparently therefore, the *Caracas* comes directly within the provision of article 464 (c) (4) of the Customs Regulations of 1937, as claimed by the plaintiff. However, such regulations seem to be an enlargement of the provisions of not only the Tariff Act of 1930 but also the Revenue Act of 1932, because there was neither cargo nor passengers upon the trip from the east coast to the west coast of the United States, and the trip was made for the specific purpose of fitting out the ship for trade, not between the east and west coasts of the United States but between the United States and one of her possessions, to wit, Alaska.

In *Standard Oil Co. of New Jersey*, *supra*, the *Leviathan* was taken under her own power from the United States to England to be broken up as scrap, and the oil there in question was laden for fuel only. The appellant there argued that the "navigation" of the vessel from New York to Rosyth, Scotland, was in itself foreign trade. The question there raised was analogous to the question here presented. There the language under consideration was "actually engaged in foreign trade" and here it is "actually engaged in * * * trade between the Atlantic and Pacific ports of the United States." The court stated:

If transactions like that at bar had been called to the attention of Congress, or if their occurrence were so frequent as to be within the congressional mind at the time of framing the exempting provision, we can conceive of no reason why it should not have used appropriate language to have included a transaction such as that at bar in the exempting provision, but there is nothing in the pro-

vision itself, or in the legislative history connected therewith, that would suggest that the Congress, when it used the term "actually engaged in foreign trade" had in mind circumstances like those presented by the instant appeal.

\*     \*     \*.     \*     \*     \*     \*     \*

\*  \*  \*. We think that when Congress used the term "actually engaged in foreign trade" it had in mind the common, ordinary meaning of the term "foreign trade" as defined in the dictionary definition above-quoted.

The court there quoted from Funk & Wagnalls New Standard Dictionary the definition of "foreign trade" as the commercial interchange of commodities from different countries. Trade in the Century Dictionary and Cyclopedia is defined as:

8. The exchange of commodities for other commodities or for money; the business of buying and selling; dealing by way of sale or exchange; commerce; traffic. \*  \*  \*. It is, however, chiefly used to denote the barter or purchase and sale of goods, wares, and merchandise, either by wholesale or by retail. \*  \*  \*. *Domestic* or *home trade* is the exchange or buying and selling of goods. within a country. \*  \*  \*.

If Congress had in mind the common, ordinary meaning of the term "foreign trade" as used in section 309, likewise in referring to trade between the Atlantic and Pacific ports of the United States, or between the United States and any of its possessions, it used the term *trade* as applied to such ports in its ordinary meaning. Consequently vessels entitled to receive oil exempt from the excise tax are such as are actually engaged in trade as above defined. Clearly the vessel *Caracas* at the time the oil was received on board was not actually engaged in any such undertaking. The use of the oil was for no other purpose than the delivery of the vessel from one purchaser to another. As stated in the *Standard Oil Co. of New Jersey* case, *supra*, "The vessel itself \* \* \* was the article or merchandise" which necessitated the voyage from the east to the west coast.

The case of *Standard Oil Co. of Louisiana* v. *United States*, 3 Cust. Ct. 39, C. D. 199, relied upon by the plaintiff is not in point and easily distinguishable from the situation here before us. In that case the S. S. *Delmundo* was operated on a regular schedule from New Orleans to gulf ports to pick up cargo for South America and to discharge cargo from South America, and return to New Orleans to pick up cargo there for South America. The scheduled voyages began and ended at New Orleans. At the time the oil there in question was laden on board, the vessel had completed the fifteenth of such voyages and was preparing for the sixteenth. Thereafter the *Delmundo* left New Orleans for Pensacola in ballast *for the purpose of taking on cargo for South America*. At Pensacola the vessel took on such cargo and surrendered her enrollment for temporary registry, sailing the same day bound for Buenos Aires via Mobile, New Orleans, Rio de Janeiro, Santos, and Montevideo, securing at New Orleans her permanent

registry under which she completed her voyage. The vessel had surrendered her registry and became enrolled so that she could proceed from port to port to pick up cargo for South America and have only one pilot for the trip rather than several. The court stated:

The uncontroverted evidence in the case at bar shows that at the time the oil in issue was laden aboard the *Delmundo* she was operating on a regular schedule in the foreign trade. * * * .

The schedule of the *Delmundo* called for stops at Pensacola, Mobile, and New Orleans to pick up cargo for South American ports. These stops were as much part of her schedule while engaged in the foreign trade as the calls at Rio, Santos, Victoria, Montevideo, and Buenos Aires. The sole purpose thereof was to lade foreign-bound cargo for carriage without transshipment to foreign ports. * * *.

The loading of cargo at Pensacola, Mobile, and New Orleans destined for South America was not interstate or coastwise trade, but foreign trade, and since it was necessary for the *Delmundo* to proceed first to Pensacola for such purpose on her regular schedule the voyage made from New Orleans to Pensacola in ballast must also be considered as part of the operation of the vessel in the foreign trade. * * *.

In that case the moment the *Delmundo* left New Orleans for Pensacola, even though in ballast, she had started upon her regular scheduled voyage as a part of her foreign trade. Here, the *Caracas* took on the fuel oil for purposes other than as an incident in trade between the United States and any of its possessions, to wit, for delivery of itself from the east to west coast, where it was to be refitted so as to become able to enter into actual trade between the United States and one of its possessions.

For the reasons stated, we hold that the collector properly assessed an internal revenue tax of ½ cent per gallon under section 601 of the Revenue Act of 1932 upon the fuel oil in question. Judgment will be rendered in favor of the Government.