(C. D. 1516)

Asiatic Petroleum Corp. *v.* United States

## United States Customs Court, Third Division

(Decided April 9, 1953)

*Sharretts, Paley & Carter* (*Amos B. Sharretts* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*William J. Vitale*, special attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: The controversy in this case involves the applicability of an internal revenue tax assessed by the collector of customs upon 26,703 gallons of bonded fuel oil from warehouse entry number 10360, entered January 2, 1948, and 27,059 gallons of bonded fuel oil from warehouse entry number 03872, entered October 9, 1947. The fuel oil in question was imported by the plaintiff. The American-Hawaiian Steamship Co. ordered said quantities of fuel oil from the plaintiff to be delivered to the steamship *Frank A. Munsey* for use as fuel supplies. The internal revenue tax was assessed by the collector upon said quantities of fuel oil covered by the foregoing entries, and demand was made upon the plaintiff for payment of same. The tax was levied at the rate of ¼ of 1 cent per gallon under the provisions of sections 3420 and 3422 of the Internal Revenue Code. Counsel for the plaintiff claims that the controversial fuel oil is exempt from the imposition of the tax under the provisions of section 309 (a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1309).

At the trial, it was stipulated and agreed between counsel for both sides as follows:

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the plaintiff and the Assistant Attorney General for the United States as follows:

1. That the SS "FRANK A. MUNSEY" was a vessel of United States Registry engaged in foreign trade prior to January 16, 1948 and that it surrendered such registry on January 16, 1948 at the Port of New York.

2. That the SS "FRANK A. MUNSEY" was enrolled and licensed at the Port of New York on January 16, 1948 for a voyage between the Atlantic and Pacific ports of the United States.

3. That after the said vessel was enrolled and licensed on January 16, 1948 that 26,703 gallons of bonded fuel oil from WHB entry No. 10360 entered January 2, 1948 (protest No. 167820–K) and 27,059 gallons of bonded fuel oil from WHB entry No. 03872 entered October 9, 1947 (protest No. 167821–K) together with other bonded fuel oil from other entries not involved herein were withdrawn from bonded warehouse and actually laden for vessel supplies aboard the SS "FRANK A. MUNSEY" at New York on January 16, 1948.

4. That the itinerary of the vessel for the voyage from the Atlantic coast to the Pacific coast of the United States was as follows:

| | | |
|---|---|---|
| Jan. | 12, 1948 | Arrived New York from Algiers |
| " | 19 | Sailed in ballast for Boston |
| " | 20 | Arrived Boston—loading cargo |
| " | 22 | Sailed for Philadelphia |
| " | 24 | Arrived Philadelphia—loading cargo |
| " | 28 | Sailed for New York |
| " | 29 | Arrived New York—loading cargo |
| Feb. | 1 | Sailed for West Coast |
| " | 9 | Arrived Cristobal and transited Canal |
| " | 20 | Arrived Los Angeles—discharging cargo |
| " | 24 | Sailed for San Francisco |
| " | 26 | Arrived San Francisco—discharging cargo |
| " | 29 | Sailed for Seattle |
| Mar. | 4 | Arrived Seattle—discharging cargo |
| " | 5 | Sailed for Portland |
| " | 6 | Arrived Portland—discharging cargo |
| " | 7 | Cargo discharged and voyage ended |

Vessel then entered foreign trade and cleared for Yokohama.

5. That said vessel surrendered enrollment at San Francisco on February 27, 1948.

6. That all pertinent Customs Regulations required for the voyage aforesaid with the exception of the timely filing of the so-called certificate of use prescribed by section 10.64 of the Customs Regulations of 1943 (19 C. F. R. § 10.64) were complied with.

IT IS FURTHER STIPULATED AND AGREED that the protests be submitted on this stipulation, and that counsel for plaintiff be granted 30 days from the date of filing of this stipulation within which to file a brief and that government counsel be granted 30 days thereafter within which to file a reply brief.

Section 309, as amended by the Customs Administrative Act of 1938, and the customs regulations in question provide, as far as applicable, as follows:

SEC. 309. SUPPLIES FOR CERTAIN VESSELS AND AIRCRAFT.

(a) EXEMPTION FROM CUSTOMS DUTIES AND INTERNAL-REVENUE TAX.— Articles of foreign or domestic manufacture or production may, under such regulations as the Secretary of the Treasury may prescribe, be withdrawn from bonded warehouses, bonded manufacturing warehouses, or continuous customs custody elsewhere than in a bonded warehouse free of duty or internal-revenue tax for supplies (not including equipment) * * * of vessels * * * actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions, * * *.

(b) DRAWBACK.—Articles withdrawn from bonded warehouses, bonded manufacturing warehouses, or continuous customs custody elsewhere than in a bonded warehouse and articles of domestic manufacture or production, laden as supplies upon any such foreign vessel or any such vessel * * * of the United States * * * shall be considered to be exported within the meaning of the drawback provisions of this Act.

(c) ARTICLES REMOVED IN, OR RETURNED TO, THE UNITED STATES.—Any article exempted from duty or tax, or in respect of which drawback has been allowed, under this section or section 317 of this Act and thereafter removed in the United States from any vessel or aircraft, or otherwise returned to the United States, shall be treated as an importation from a foreign country.

\* \* \* \* \* \* \*

Sections 10.59 and 10.64 of the Customs Regulations of 1943 (19 C. F. R. § 10.59 and § 10.64) are as follows:

**10.59 Exemption from customs duties and internal-revenue tax.**—(a) A vessel shall not be considered to be actually engaged in the foreign trade, or in trade between the Atlantic and Pacific ports of the United States, or between the United States and its possessions, as the case may be, for the purpose of withdrawing supplies from bonded warehouses free of duty and internal-revenue tax pursuant to section 309 (a), Tariff Act of 1930, as amended, unless it is—

\* \* \* \* \* \* \*

(2) Actually transporting passengers or merchandise to or from a foreign port, a port on the opposite coast of the United States, or between a port in a possession of the United States and a port in the United States or in another of its possessions;

\* \* \* \* \* \* \*

(4) Departing in ballast from the port at which the withdrawal is made for a foreign port, a port on the opposite coast of the United States, a port in one of the possessions of the United States \* \* \* for the purpose of lading passengers or cargo at the port of destination for transportation in a class of trade specified in section 309 (a), Tariff Act of 1930, as amended, for which class of trade the vessel is suitable and seaworthy at the time of leaving the port of withdrawal and from which it is not diverted prior to such lading.

**10.64 Crediting or cancellation of bonds.**—(a) The warehouse or rewarehouse entry bond or the bond provided for in section 10.60 (c) or (f) covering articles withdrawn for use as supplies of a vessel may be credited or canceled in respect of such articles if an affidavit in the form prescribed below is filed with the collector at the port of withdrawal within 6 months after the date of withdrawal. *Such affidavit shall not be required as a condition for crediting or canceling the bond as to articles which after lading are treated as imported under section 309 (c), Tariff Act of 1930, as amended, or which are used on a vessel while it is engaged in a class of trade in which it is required to enter.* The 6 months' period for the production of the affidavit when required may be extended as provided for in section 25.16. The affidavit shall be executed by the master or other officer of the vessel on which the articles are used who has knowledge of the facts, and shall be in substantially the following form [italics not quoted]:

I, _____, of the vessel _____,
 (Master or other officer)
declare that I have knowledge of the facts set forth herein, and that, during the period any of the articles covered by withdrawal No. _____, filed at _____, (as listed in the vessel's stores log of supplies
 (Name of port)
withdrawn from bond) remained on board unused, the said vessel was engaged in the business or trade checked below:

　1. Fisheries.
　2. Whaling.
　3. Trade between Atlantic and Pacific ports of the United States.
　4. Trade between the United States and any of its possessions.
　5. Foreign trade.

_____
(Name and title)

Counsel for the plaintiff contends that where fuel oil is withdrawn from bonded warehouse and laden as supplies upon board a vessel which is actually engaged in a type of trade specified in section 309 (a),

*supra,* the Government has no further interest in it from a tax standpoint. Therefore, the filing of the affidavit of use, specified in section 10.64 (*a*), *supra,* is not a mandatory condition precedent to exemption from duty or internal revenue tax on such fuel oil. The cases of *United States* v. *Gulf Oil Corporation,* 32 C. C. P. A. (Customs) 133, C. A. D. 297, and *Asiatic Petroleum Corp.* v. *United States,* 36 C. C. P. A. (Customs) 9, C. A. D. 389, are cited and relied upon.

Counsel for the plaintiff further contends that a vessel which has laden fuel oil as vessel supplies, without the payment of the tax, by reason of the nature of the trade in which employed, does not lose the tax-free status of such fuel oil by proceeding from port to port on the Atlantic coast of the United States to lade cargo destined for the Pacific coast, her intended destination, nor does she lose such status in discharging said cargo at various ports on the Pacific coast, citing *Standard Oil Co. of Louisiana* v. *United States,* 3 Cust. Ct. 39, C. D. 199, and *United States* v. *Gulf Oil Corporation, supra.*

Counsel for the Government contends that compliance with the customs regulations is a condition precedent to recovery and that the plaintiff has not established use of the merchandise as supplies; that the filing of the affidavit is reasonable and necessary to insure that the intention of the Congress is carried out; and that plaintiff has failed to show that the regulation is unreasonable, unnecessary, or impracticable of compliance, citing *United States* v. *Mexican Petroleum Corp.,* 28 C. C. P. A. (Customs) 90, C. A. D. 130. It is argued in that respect that section 10.64, *supra,* is one of the regulations issued pursuant to the authority of Congress, in exempting ships' supplies from the payment of duty or tax, in order to see that its intentions are carried out. Government counsel construes said section 10.64, relative to when the affidavit is not required and when it is mandatory, as follows:

\* \* \* Such an affidavit is not required if after lading, such articles are treated as imported under Section 309 (c), *supra,* or "are used on a vessel while it is engaged in a class of trade in which it is required to enter." Clearly, therefore, such an affidavit is required only when the articles are not removed in, or returned to the United States as prescribed by Section 309 (c) or when the articles are used on a vessel while it is engaged in a trade in which it is required to enter.

In other words, the Collector is entitled to know whether or not the vessel departed from the business or trade for which it was required to enter at the time of withdrawal of the supplies.

Government counsel further contends that the *Gulf Oil Corporation* and the *Asiatic Petroleum Corp.* cases, *supra,* are not in point because, in the *Gulf* case, *supra,* the court merely found that the right to drawback accrued when the supplies were laden, inasmuch as section 309 (b) of the law provided that such class of merchandise "shall be considered to be exported within the meaning of the drawback provisions of this Act"; and section 309 (a), here at issue, has no such

provision. Government counsel distinguished the *Asiatic* case, *supra*, from the case at bar because of the character of the oath of use, the so-called "use" affidavit in the *Asiatic* case being for the purpose of showing that the supplies were consumed on board and not landed, whereas in the case at bar the oath of "use" of the vessel is required. It was also pointed out that the *Asiatic* case, *supra*, did not involve the specific statutory provision applying to drawback at issue in the *Gulf* case, *supra*, and although the appellate court in the *Asiatic* case, *supra*, cited the *Gulf* case, *supra*, as authority for holding that the oil laden as fuel on board a vessel engaged in foreign trade became an exported article, Government counsel states that—

* * * It is therefore difficult, if not impossible, for us to see any analogy between the two cases. * * *.

It appears manifest from the court's decision in the *Asiatic Petroleum Corp.* case, *supra*, that the appellate court disregarded the applicability of the regulation involved therein requiring an affidavit showing use of the oil because the statute no longer prohibited the supplies from being landed in the United States or in any of its possessions.

It is further contended that the plaintiff has failed to prove that the involved oil was consumed on board the vessel as supplies while it was actually engaged in trade between the Atlantic and Pacific ports of the United States, or other business or trade, as required by the statute, under which exemption from taxation is sought. In that respect, it is argued that it has not been shown whether the oil withdrawn for vessel supplies was consumed on either or both of the voyages mentioned (that is, the coastwise trade or the foreign trade out of Portland), or whether it was diverted to some other use, Government counsel stating in that respect as follows:

* * * It is possible and probable that the oil could be transferred to a vessel of war belonging to a nation which does not reciprocate such privilege toward vessels of war of the United States, or placed in otherwise unfriendly hands, or be diverted to a use other than one of those enunciated in section 309 (a), *supra*. It is submitted, therefore, that the plaintiff has failed to make out a *prima facie* case. Please see the decision in the case of *Thornley & Pitt et al. v. United States*, 19 C. C. P. A. (Customs) 221, T. D. 45325, wherein the appellate court held, in a similar action, that even if the transport vessels involved therein were engaged in one of the pursuits mentioned in the statute, the finding of the court below that "there is in the record no legal evidence * * * that the supplies withdrawn were furnished to and consumed on said transports" would have to be sustained.

Counsel further points out that the appellate court in the *Asiatic* case, *supra*, did not discuss or distinguish the *Thornley* case, *supra*, in reversing this court, even though it was followed as authority in this court's decision.

In view of the decisions discussed in the brief of Government counsel and his apparent disagreement with the appellate court in the *Asiatic* case, *supra*, we think it pertinent to review the several cases involving duty or taxes assessed upon ships' supplies.

The case of *Thornley & Pitt et al.* v. *United States, supra,* cited by Government counsel, involved the duties assessed upon certain meats withdrawn from bonded warehouse for use as supplies aboard Army transports. The collector refused to issue withdrawal entries and required straight consumption entries for the meats on the ground that transports were not documented vessels of the United States within the meaning of section 14 of the act of July 24, 1897. The Government there conceded that the meats were withdrawn for supplies for Army transports. Although it was shown that the transports were plying between certain Atlantic ports and San Francisco, Manila, and Guam, this court, in T. D. 44500, although finding that the collector erred in deciding that the transports were not vessels of the United States, held that there was no legal evidence presented to establish that the transports were engaged in foreign trade, nor in trade between the Atlantic and Pacific ports of the United States, nor that the supplies withdrawn were furnished to and consumed on said transports. The appellate court, on the other hand, assumed, without deciding, that the transports were vessels of the United States and did not deem it necessary to pass upon the issue of whether or not said transports were engaged in trade. In affirming the decision of this court, however, the appellate court held that—

In order to obtain the benefits of section 14, Tariff Act of 1897, it must affirmatively appear before the final liquidation that the supplies withdrawn were "landed on the vessel" and not landed therefrom at any port in the United States.

The failure of the evidence to supply such information was held fatal to the appellant's contention.

Since the decision in the *Thornley & Pitt* case, *supra,* the law has been changed relative to the prohibited landing of such supplies at any port in the United States. Under section 309 (b) and (c), articles withdrawn, or laden as supplies upon vessels, are to be considered exported. If landed, however, they are to be treated as importations. In view of such changes in the law, it is understandable why the appellate court did not refer to the foregoing case in deciding the *Asiatic* case, *supra.* The *Thornley & Pitt* case, *supra,* is equally inapplicable as an authority to sustain Government's contention in the pending case.

In the case of *Standard Oil Co. of Louisiana* v. *United States,* 3 Cust. Ct. 39, C. D. 199, certain oil was withdrawn from warehouse for use as fuel supplies on a vessel engaged in foreign trade. Upon liquidation of the entry under which the oil was imported, the tax applicable at the time of entry was assessed. The fact that the oil was withdrawn for fuel supplies was not considered. It appeared that the vessel operated upon a regular schedule between New Orleans and South American ports, picking up cargo in Gulf ports and dis-

charging cargo from South America. No domestic cargo was carried for domestic ports. When the vessel arrived, she discharged her cargo at New Orleans and took on fuel oil for the return trip. She also surrendered her certificate of registry and obtained a certificate of enrollment in order to make her way from port to port with one pilot rather than three. She then left New Orleans in ballast to pick up cargo in Pensacola, Fla. There, also, she surrendered her enrollment for temporary registry. Upon her return to New Orleans, she secured her permanent registry under which the voyage to South America was completed.

The court was of opinion that the collector refused to allow exemption from tax for the reason that, at the time of lading the oil, the vessel was not documented for the foreign trade. The court pointed out that the vessel was entitled, under the Navigation Laws of the United States (title 46, U. S. C. A., chap. 12, sec. 264), to surrender her certificate of registry and obtain a certificate of enrollment. The same situation prevailed in the pending case. There, the court found from the evidence that the vessel was operating on a regular schedule in the foreign trade at the time the oil was laden and that the scheduled stops to pick up cargo were as much a part of her schedule in the foreign trade as stops at South American ports, and it was held that the oil was exempt from the imposition of tax. In the situation before us in this case, the evidence establishes that the vessel completed her coastwise schedule.

In the case of *United States* v. *Mexican Petroleum Corp., supra,* the collector assessed tax upon certain fuel oil delivered to the *City of Hamburg,* bound from Baltimore for foreign ports, for the reason that the Customs Regulations of 1931 relative to the filing of the affidavit had not been complied with. The Customs Court held that certain portions of the regulations were invalid where the exemption of the tax depended upon the performance of an act not within the power of the party seeking such exemption. The appellate court, however, reversed the decision of this court, holding the regulations to be reasonable and valid and that they must be complied with. The appellate court observed that section 309 of the Tariff Act of 1930, in making provision for the exemption of ships' supplies from customs duties or internal revenue tax, provided "but no such article shall be landed at any port or place in the United States or in any of its possessions," and, further, that since the statute itself prescribed that ships' supplies were only conditionally free of duty or tax, under regulations by the Secretary of the Treasury, compliance therewith merely insured that the intention of Congress be carried out, and that such regulations were in conformity with the statute and, therefore, were held reasonable and valid in view of the statute itself. This case arose prior to the amendment of section 309 of the act by the Customs Adminis-

trative Act of 1938, and, like the decision in the *Thornley & Pitt* case, *supra*, is not now applicable. It will be noted that such portion of section 309 (a) of the act as reads "but no such article shall be landed at any port or place in the United States or in any of its possessions" was deleted in the amendment appearing in the Customs Administrative Act of 1938, and a new section (c) was added which provided that any article exempted from duty or tax, which is thereafter removed from any vessel in the United States, shall be treated as an importation from a foreign country.

In the case of *Gulf Oil Corporation* v. *United States*, 12 Cust. Ct. 108, C. D. 837, certain vessels, documented and registered to engage in foreign trade, were changed to enrollment for the purpose of engaging in coastwise trade. Certain fuel oil had been placed on board as supplies in journeys to foreign ports, and the records indicated that the oil had been laden under notices of intent to export with benefit of drawback, having been manufactured from imported crude petroleum upon which duty had been assessed and paid. There was no subsequent landing of the oil in the United States. The claims for drawback were paid, excepting upon the quantity of oil remaining on board at the time of the change in documentation. The reason for such nonallowance was that it had been used as ships' supplies on vessels engaged in coastwise trade and was not considered to be entitled to the drawback benefits provided in the statutes and regulations covering ships' supplies. The court there also noted that a tax at the rate of $\frac{1}{4}$ of 1 cent per gallon under the provisions of sections 3420 and 3422 of the Internal Revenue Code, as modified by T. D. 50015, had been levied. It also noted that section 3451 of such code provided that articles manufactured or produced in the United States with the use of articles upon the importation of which tax had been paid, if laden for use as supplies on vessels actually engaged in foreign trade, shall be held to be exported for the purposes of section 3430. The court, in holding that the collector erred in disallowing the drawback in question, stated:

* * * it appears that after lading the ships actually cleared for voyages in foreign trade. In our view, therefore, the right to recover drawback under the facts set forth in the stipulation became absolute, and the collector's refusal to allow it was erroneous.

Upon appeal, *United States* v. *Gulf Oil Corporation*, *supra*, the appellate court held that it was the definite purpose of Congress to make drawback effective at the time supplies were laden upon vessels actually engaged in foreign trade, and that such purpose was further indicated by the provisions of section 309 (c), Tariff Act of 1930, subjecting such exported supplies to import duties and taxes, if subsequently landed in the United States. The Government there contended that the act of exportation was not completed nor effected within the mean-

ing of the law unless the goods in question were utilized in the course of foreign trade. In deciding adversely to such contention, the appellate court pointed out that section 446 of the Tariff Act of 1930 provides that vessels arriving in the United States from foreign ports may retain their fuel supplies on board without the payment of duty. In holding that the act of lading the oil upon the vessel was the act of exportation thereof, which made the drawback effective, the appellate court stated:

> The definite purpose of Congress to make drawback effective at the time the supplies are laden is indicated by its enactment of legislation designed to protect the Government against loss of revenue by imposing an import tax to be paid or repaid by the owner of exported supplies in the event the exported supplies are subsequently landed in the United States (sec. 309 (c), Tariff Act of 1930, as amended).
>
> Such purpose of Congress is further indicated by its enactment of remedial legislation following a court decision to the effect that the act of exportation was not completed and drawback was not effective until the laden supplies had reached their ultimate destination. *Swan and Finch Co.* v. *United States*, 190 U. S. 143. Congress then expressly provided that articles or products of domestic manufacture laden as supplies upon vessels actually engaged in foreign trade "shall be considered to be exported within the meaning of the drawback provisions of this Act" (sec. 309 (b), Tariff Act of 1930, as amended).
>
> The clear intent of the legislation enacted by Congress relative to the exportation of products of domestic manufacture to be used as supplies on vessels engaged in foreign trade is to place American manufacturers upon an equal footing with foreign competitors and to provide profitable employment for American labor and capital.
>
> Vessels employed in the fisheries or in the whaling business, or actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States and any of its possessions are designated as beneficiaries of the legislation enacted, for the reason that such vessels in their regular course of business are in position to obtain fuel supplies free of tax in foreign ports. Without this legislation, owners of such vessels would load their fuel supplies free of tax in foreign ports, thereby depriving this country of revenue and of its competitive market for the product. See Section 309 (a), *supra*; also Senate Report No. 58, Seventy-third Congress, First Session, May 1, 1933, to accompany H. R. 5040.

Section 309 (c), *supra,* rather than prohibiting the landing of any such supplies in the United States, now provides that such supplies, if subsequently landed in the United States, shall be treated in the same category as any other importation. Consequently, not only supplies subject to drawback, but all supplies, if treated as an importation upon return to the United States, must first be regarded as having been exported. By reason of the change in the law, the decision in the *Gulf Oil Corporation* case, *supra,* involving drawback merchandise, is applicable to the pending case.

In the case of *Asiatic Petroleum Corp.* v. *United States*, 18 Cust. Ct. 95, C. D. 1050, internal revenue tax was levied upon certain fuel oil withdrawn from warehouse for use as fuel supplies upon the steamship *Panamanian,* engaged in foreign trade within the meaning of section

309 (a), as amended, *supra*. The affidavit of the master of the vessel certifying that such oil had been used aboard the vessel and not landed in the United States or in any of its possessions was not produced. This court held that if the withdrawn supplies were not used on board the vessel, obviously the conditionally free provision does not become operative, and the oil thus remained the subject of tax. The court further stated that, in case the supplies are landed in the United States, under the provisions of section 309 (c), *supra*, they were to be treated as an importation, and the landing thereof subjected them to the imposition of a tax. This court consequently held that the filing of the affidavit was a prerequisite to the collector's determination of whether or not the tax should be imposed. The court also pointed out that there was a lack of proof that the fuel oil there in question was actually consumed aboard the vessel, and the collector was upheld in his assessment of the internal revenue tax.

Upon appeal, *Asiatic Petroleum Corp.* v. *United States, supra*, the decision of this court was reversed. The appellate court stated that the principle underlying the decision in the *Gulf Oil Corporation* case, *supra*, was applicable to the situation arising in that case. It again referred to the legislation arising from discussions in Congress, embodied in an amendment to section 309 of the Tariff Act of 1930, as a part of the Customs Administrative Act of 1938, and held that—

When appellant here withdrew fuel oil from a manufacturing bonded warehouse for supplies for a vessel engaged in foreign trade it executed bond in conformity with the pertinent regulations. The fuel oil was then laden on board a vessel engaged in foreign trade. *When so laden it became an exported article, just as the oil involved in the Gulf Oil Corporation case, supra, did, and there was no further Government interest in it from the tax standpoint.* [Italics not quoted.]

The *Gulf Oil Corporation* case, *supra*, is authority for holding that consumable supplies, taken aboard a vessel under the provisions of section 309, *supra*, are not taxable upon such portion thereof as remains unconsumed. That case also clearly construes the changes in the administrative portions of the Tariff Act of 1930 such as contained in section 309 as a congressional intent to place American manufacturers on an equal footing with foreign competitors and to provide profitable employment for American labor. Therefore, in providing that the Secretary of the Treasury promulgate regulations in order to carry out the law, it was not the intention of the Congress that such regulations should be of such nature that any of the terms of the law, as enacted, would become inoperative.

In the *Asiatic Petroleum Corp.* case, *supra*, as in the pending case, the affidavit of use was not filed. Nevertheless, the appellate court held that when the fuel supplies were laden, they became exported articles and that the Government had no further interest in it from a tax standpoint.

Therefore, it is clear that in the case at bar the provision for the filing of the affidavit of use, provided for in the regulations, is not mandatory. If the fuel oil had been landed in the United States, it would again have become the subject of tax, and such tax would have been levied against the party landing the same. Having once been laden as fuel supplies, it is to be treated as having been exported, and the company originally importing the fuel oil against which the tax was levied at the time of entry is not liable for payment of such tax.

In view of the foregoing decisions, and distinguishing the *Mexican Petroleum Corp.* case, *supra,* and for the reasons stated, judgment will be entered in favor of the plaintiff, directing the collector to reliquidate and refund all internal revenue taxes assessed upon 26,703 gallons of bonded fuel oil from warehouse entry number 10360, and 27,059 gallons of bonded fuel oil from warehouse entry number 03872.