(C. D. 1535)

ESSO EXPORT CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 17, 1953)

*Sharretts, Paley & Carter (Edward P. Sharretts* and *Amos B. Sharretts* of counsel) for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General (*William J. Vitale,* special attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: The controversy in this case involves the question of whether or not an internal revenue tax was erroneously assessed by the collector of customs upon 171,616 gallons of certain bonded fuel oil, covered by warehouse entry number 12825, dated February 13, 1948, imported by the plaintiff, which was withdrawn for use as fuel supplies upon the American steamship *George Washington.* Protest "A" was filed against the collector's demand for payment of the tax, and protest "B" was filed against his liquidation. Both protests were timely filed. The tax in question was levied at the rate of one-fourth of 1 cent per gallon under the provisions of sections 3420 and 3422 of the Internal Revenue Code, as amended. Counsel for the plaintiff claims that the fuel oil, when so laden as fuel supplies, is exempt from the imposition of the tax under the provisions of

section 309 (a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1309 (a)).

At the trial it was stipulated and agreed between counsel as follows:

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the plaintiff and the Assistant Attorney General for the United States that the above protests be consolidated for purposes of trial, and

1. That 4,620,000 gallons of fuel oil were imported into the United States at the port of New York and entered into bonded warehouse under Warehouse Bond No. 12825 dated February 13, 1948, from which 171,616 gallons were later withdrawn and laden as vessel supplies aboard the steamship GEORGE WASHINGTON;

2. That the Alaska Transportation Company purchased the steamship GEORGE WASHINGTON from the United States Maritime Commission;

3. That, before the said 171,616 gallons of fuel oil the subject of these protests were laden aboard the steamship GEORGE WASHINGTON and while said vessel was laid up at Tompkins Cove, New York, title to the said vessel was transferred from the United States Maritime Commission to the Alaska Transportation Company;

4. That the steamship GEORGE WASHINGTON was registered in the United States under marine document P. R. No. 305, ownership in the Alaska Transportation Company, home port at New York;

5. That thereafter on February 16, 1948 the said 171,616 gallons of fuel oil previously imported on Warehouse Bond No. 12825 were withdrawn from bonded warehouse under Vessel Supply entry 5607, and were laden aboard the said steamship for use as vessel supplies;

6. That the said vessel departed in ballast without passengers from New York on February 19, 1948 without clearance;

7. That the said vessel arrived at Seattle, Washington, on March 11, 1948;

8. That the said 171,616 gallons of fuel oil laden at the Port of New York for fuel supplies aboard said vessel were consumed as fuel supplies on the aforesaid voyage to Seattle where said vessel was converted and refitted to make her suitable for the Alaskan trade;

9. That on May 28, 1948 the aforesaid marine document P. R. 305 was surrendered and the aforesaid vessel was registered in Seattle to change her home port to Seattle, Washington, and to change her tonnage.

10. That on May 31, 1948 the steamship GEORGE WASHINGTON sailed from Seattle, Washington for her next scheduled port of arrival in Alaska in the Alaskan trade with passengers, cargo, ships stores and supplies laden aboard said vessel at Seattle, and that the vessel subsequently arrived at an Alaskan port;

11. That all pertinent Customs Regulations required for the voyage aforesaid between New York and Alaskan ports were complied with;

IT IS FURTHER STIPULATED AND AGREED that the protests be submitted on this stipulation and that the counsel for the plaintiff be granted 30 days from the date of filing of this stipulation within which to file a brief and that government counsel may have 30 days after plaintiff's brief is received within which to file a reply brief.

Section 309 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, so far as applicable, provides as follows:

## SEC. 309. SUPPLIES FOR CERTAIN VESSELS AND AIRCRAFT.

(a) EXEMPTION FROM CUSTOMS DUTIES AND INTERNAL-REVENUE TAX.—. Articles of foreign or domestic manufacture or production may, under such regulations as the Secretary of the Treasury may prescribe, be withdrawn from bonded warehouses, bonded manufacturing warehouses, or continuous customs custody elsewhere than in a bonded warehouse free of duty or internal-revenue tax for supplies (not including equipment) * * * of vessels * * * actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions, * * *

(b) DRAWBACK.—Articles withdrawn from bonded warehouses, bonded manufacturing warehouses, or continuous customs custody elsewhere than in a bonded warehouse and articles of domestic manufacture or production, laden as supplies upon any such foreign vessel or any such vessel * * * of the United States * * * shall be considered to be exported within the meaning of the drawback provisions of this Act.

(c) ARTICLES REMOVED IN, OR RETURNED TO, THE UNITED STATES.—Any article exempted from duty or tax, or in respect of which drawback has been allowed, under this section or section 317 of this Act and thereafter removed in the United States from any vessel or aircraft, or otherwise returned to the United States, shall be treated as an importation from a foreign country.

\*       \*       \*       \*       \*       \*       \*

The Internal Revenue Code, 26 U. S. C. § 3451, provides as follows:

### § 3451. Exemption from tax of certain supplies for vessels.

Under regulations prescribed by the Commissioner, with the approval of the Secretary, no tax under this chapter shall be imposed upon any article sold for use as fuel supplies, ships' stores, sea stores, or legitimate equipment on vessels of war of the United States or of any foreign nation, vessels employed in the fisheries or in the whaling business, or actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions. * * *

Section 10.59 of the Customs Regulations of 1943 (19 C. F. R. § 10.59) provides as follows:

**10.59 Exemption from customs duties and internal-revenue tax.**—(a) A vessel shall not be considered to be actually engaged in the foreign trade, or in trade between the Atlantic and Pacific ports of the United States, or between the United States and its possessions, as the case may be, for the purpose of withdrawing supplies from bonded warehouses free of duty and internal-revenue tax pursuant to section 309 (a), Tariff Act of 1930, as amended, unless it is—

\*       \*       \*       \*       \*       \*       \*

(4) Departing in ballast from the port at which the withdrawal is made for a foreign port, a port on the opposite coast of the United States, a port in one of the possessions of the United States * * * for the purpose of lading passengers or cargo at the port of destination for transportation in a class of trade specified in section 309 (a), Tariff Act of 1930, as amended, *for which class of trade the vessel is suitable and seaworthy at the time of leaving the port of withdrawal and from which it is not diverted prior to such lading.* [Italics not quoted.]

The invoice and entry papers show that the tax was assessed upon this particular oil because the vessel departed in ballast and did not engage in trade on the voyage to Seattle.

Counsel for the plaintiff contends that the steamship *George Washington,* while proceeding between the ports of New York and Seattle on the voyage from New York to an Alaskan port, was actually engaged in trade between the United States and one of its possessions within the meaning of section 309 (a), *supra,* as amended, and section 3451 of the Internal Revenue Code, citing *Standard Oil Company of New Jersey* v. *United States,* 32 C. C. P. A. (Customs) 190, C. A. D. 306; and *Standard Oil Co. of Louisiana* v. *United States,* 3 Cust. Ct. 39, C. D. 199.

Counsel for the plaintiff further contends that such portion of section 10.59 (a) (4), *supra,* is restrictive of the statute and invalid insofar as it specifies that a vessel departing in ballast for the purpose of lading passengers or cargo at the port of destination for transportation in a class of trade specified in section 309 (a), *supra,* shall not be within one of the exemptions unless it is suitable and seaworthy to engage in such destined trade at the time of leaving the port of withdrawal, for the reason that such requirement is not contained therein and is inconsistent with the intent of the statute.

In that respect, it is argued that section 309 (a), *supra,* and section 3451 of the Internal Revenue Code, *supra,* specifically authorize the Secretary of the Treasury to prescribe regulations regarding the withdrawal of articles from customs custody for the purposes specified in such sections of the law. For purposes of withdrawal, the methods and mechanics thereof and of lading aboard vessels are entirely within his control. His regulations must be in harmony with the statutes and where he has sought to impose additional conditions or restrictions, such regulations have been held to be invalid, citing *Davies, Turner & Co.* v. *United States,* 25 Cust. Ct. 182, C. D. 1283; and *United States* v. *Ricard-Brewster Oil Co.,* 29 C. C. P. A. (Customs) 192, C. A. D. 191.

Counsel for the plaintiff also cites the cases of *United States* v. *Gulf Oil Corporation,* 32 C. C. P. A. (Customs) 133, C. A. D. 297; and *Asiatic Petroleum Corp.* v. *United States,* 36 C. C. P. A. (Customs) 9, C. A. D. 389, where the appellate court discussed the purposes of the enactment of the legislation designed to enable certain vessels to procure vessel supplies free of duty or internal revenue tax.

Counsel for the Government contends that section 309 (a), *supra,* specifically prescribes that vessels must be *actually* engaged in such trade, and it does not cover, and was not intended to cover, subsequent voyages, and that the issue here is identical with the issue in the *Standard Oil Company of New Jersey* case, *supra.* Government counsel points out that the *Standard Oil Co. of Louisiana* case, *supra,* was clearly distinguished by this court in the *Standard Oil Company of New Jersey* case, 13 Cust. Ct. 1, C. D. 858, affirmed by the appellate court, C. A. D. 306, *supra.*

It is further contended that such portion of section 10.59 (a) of the customs regulations which specifies that a vessel be "suitable and seaworthy at the time of leaving the port of withdrawal," attacked by the plaintiff as being invalid, is not at issue herein, but if it were, it must be admitted that the vessel was not suitable for Alaskan trade at the time it left the port of withdrawal.

All of the regulations attending the free entry of the oil in question were complied with and the only question presented is whether the steamship *George Washington* was actually engaged in the intercoastal trade on the trip from New York to Seattle in ballast where her registration was surrendered, her home port changed from New York to Seattle, and the trade in which she was engaged changed to enable her to engage in trade between the United States and Alaska, for which possession she subsequently departed with passengers and cargo, after having undergone certain changes in tonnage.

In the case of *Standard Oil Company of New Jersey, supra,* involving a similar question, the *Caracas* proceeded from New York to Seattle in ballast, without cargo or passengers. The Alaska Steamship Co. purchased the ship for the purpose of transporting her to Seattle to enter into trade between the United States and Alaska, and the vessel was sent in ballast to Seattle on the Pacific coast for outfitting and to begin from there a trade with Alaska. The trial court held that the *Caracas*, at the time the oil was received on board, was not actually engaged in any such undertaking, and the oil was used for no other purpose than the delivery of the vessel from one purchaser to the other. The appellate court, however, found nothing in the record to warrant the finding that the fuel oil in question was used for the purpose of delivering the *Caracas* from the Grace Line to the Alaska Steamship Co. However, the court further stated that the purpose of the pertinent provisions of section 630 (53 Stat. 419, 26 U. S. C. § 3451) are clear, stating:

* * * Under those provisions fuel oil used as supplies is exempt from the tax only in the event the vessel on which it is used is "actually engaged in * * * trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions," and the customs officials and the courts may not enlarge upon such provisions.

The question for determination, therefore, is: Was the *Caracas* on its voyage from the port of New York to the port of Seattle actually engaged in trade between those ports or between the United States and Alaska?

The court rejected the *Standard Oil Company of Louisiana* case, *supra,* as an authority, where the *Delmundo*, although transported in ballast to Gulf ports, was held to have been actually engaged in trade. The appellate court stated, however, when holding that the *Caracas* was not actually engaged in trade, that it was not intended to hold that a ship was not actually engaged in trade merely because it left

port in ballast. But in view of the fact that the evidence was to the effect that the *Caracas* was transported in ballast from New York to Seattle to be outfitted and made suitable "to enter into" trade between the United States and Alaska, she was held not actually engaged in trade between the ports of New York and Seattle during which trip the oil in question was consumed. Nor was she ever established to have been actually engaged in trade between the United States and Alaska. The court was unable to accept the views of counsel for appellant that the voyage of the *Caracas* from New York to Seattle should be regarded as a continuous trip from New York to Alaska, first, because such was directly contrary to the stipulated facts, and, second, because there was no evidence that the *Caracas* ever actually engaged in trade between the United States and Alaska. For such reasons, the decision of the trial court was affirmed. Judge O'Connell, however, dissented, as he was of the opinion that the voyage of the *Caracas* fell squarely within the facts and interpretation of the law as enunciated in the case of the *Delmundo*.

In the case of *Asiatic Petroleum Corp.* v. *United States*, 36 C. C. P. A. (Customs) 9, C. A. D. 389, certain fuel oil withdrawn for supplies upon the steamship *Panamanian*, a vessel engaged in foreign trade, was assessed a tax of one-fourth of 1 cent a gallon for the reason that the master of the vessel had failed to file an affidavit of use certifying that the oil had been used on board and none of it had been landed in the United States.

The court noted the different phraseology of section 309, as amended by the Administrative Act of 1938, and that it was the appellant's position that inasmuch as the fuel oil had been shown to have been withdrawn from warehouse and laden on the vessel for use as supplies, it became at once entitled to exemption from the tax and that to require any affidavit went beyond the requirement of the statute which specifically allows exemption from duties and internal revenue taxes, or the drawback of such duties and taxes if paid, to articles laden as supplies upon a vessel actually engaged in foreign trade, and relied upon the *Gulf Oil Corporation* case, *supra*.

The appellate court followed the *Gulf Oil Corporation* case, *supra*, stating:

In that case bunker fuel oil produced and manufactured in the United States from imported crude petroleum, duty upon which crude material had been paid by the appellee [*sic*], was laden upon United States ships engaged at the time of lading in foreign trade. It was so laden for use as fuel supplies. *After a round trip to a foreign country, the vessels changed registry and became engaged in the coastwise trade.* At the time of changing registry much of the oil (in the aggregate 1765 barrels) originally laden on the vessels remained unused. It was not landed in the United States or any of its possessions. The importer, which, as has been stated, had paid the duties on the crude material imported, filed claims for drawback on all the fuel oil originally laden on the vessels. The collector allowed

drawback on the quantity used in making the round trip to and from the foreign country, but refused it as to the quantities remaining after that trip. This court, JACKSON, Judge, dissenting, affirmed the judgment of the United States Customs Court entered in conformity with its decision which was to the effect that drawback should be allowed on the entire quantity originally laden on the vessels.

The decision was based upon the statute which provided, in effect, that articles laden upon a vessel, as vessel supplies, should be considered to be exported when laden.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

We are of opinion that the principle underlying the decision in that case is applicable here.

When appellant here withdrew the fuel oil from a manufacturing bonded warehouse for supplies for a vessel engaged in foreign trade it executed bond in conformity with the pertinent regulations. *The fuel oil was then laden on board a vessel engaged in foreign trade.* When so laden it became an exported article, just as the oil involved in the *Gulf Oil Corporation* case, *supra*, did, and there was no further Government interest in it from the tax standpoint. [Italics not quoted.]

The case of *Asiatic Petroleum Corp.* v. *United States*, 30 Cust. Ct. 169, C. D. 1516, involved a situation where a vessel in foreign trade had surrendered her registry to engage in such trade and became enrolled and licensed for a voyage between the Atlantic and Pacific ports of the United States. She then took on board fuel supplies and sailed in ballast for Boston where she loaded cargo as well as in other Atlantic ports. Upon reaching the Pacific coast, she discharged cargo at various ports. However, when arriving at San Francisco, she not only discharged cargo, but also surrendered her enrollment, and then continued up the coast discharging her cargo. At Portland, the vessel entered the foreign trade and cleared for Yokohama. The plaintiff contended that where fuel oil is withdrawn from bonded warehouse and laden as supplies upon board a vessel which is actually engaged in a type of trade specified in section 309 (a), *supra*, the Government has no further interest in it from a tax standpoint, and, therefore, the filing of an affidavit of use was not necessary.

The Government contended that such filing of the affidavit of use was a condition precedent to the recovery and, further, that the plaintiff failed to prove that the oil was consumed on board the vessel as supplies while it was actually engaged in trade between the Atlantic and Pacific ports of the United States.

This court held in that case that the provision for the filing of the affidavit was not mandatory and that, having once been laden as fuel supplies, the oil was to be treated as having been exported.

Respecting the *George Washington*, at issue herein, had she loaded cargo for the trip to the Pacific coast, the oil in question, under the decisions cited, would have been exempt from the internal revenue tax. Although the regulations include within the definition of the

words "actually engaged in * * * trade" a vessel departing in ballast from the port at which the withdrawal is made for a port on the opposite coast of the United States, the courts have not specifically construed the term "actually engaged."

It would appear, however, under the decision in the *Asiatic Petroleum Corp.* case, *supra*, that when fuel oil is withdrawn from bonded warehouse and laden under regulations as supplies on board a vessel, for all intents and purposes it becomes exported merchandise within the intent of the statute. In such event, all that is necessary in determining the tax status of fuel oil laden as supplies is to ascertain at the time of lading whether or not the vessel so laden is under registry or enrollment and license for the particular service mentioned in the statute. Whether or not the particular vessel is suitable or seaworthy for the service mentioned, would be within the province of the particular bureau issuing the documentation. When documented for a particular service, such documentation, in our opinion, is sufficient evidence to warrant the conclusion that the vessel is actually engaged in the particular trade in which documented. Should the vessel engage in any other trade, without a change of the documentation, there would be such violation as would be actionable under the shipping laws, and the application of consequent penalties.

The *George Washington*, at the time the oil in question was withdrawn as supplies, according to the record, was documented for an intercoastal voyage. Under the shipping laws, title 46, §§ 25 and 29, an American-built vessel belonging wholly to citizens of the United States may be registered to engage in coastwise trade. There is no doubt that when so registered the vessel was suitable and seaworthy for such service at the time of leaving the port of registry. From the evidence before us, there also is no doubt that the voyage undertaken by the *George Washington* involved a necessary activity of commercial intercourse. That is to say, it was necessary that the vessel depart in ballast for Seattle in order that the activity which motivated the voyage might be consummated. The evidence establishes that not only did the vessel arrive at the port of destination but actually entered the ultimate trade for which she was destined at the beginning of the voyage.

The case of *Jordan* v. *Tashiro*, 278 U. S. 123, 127, construes the terms "commerce," or "commercial," and "trade" as follows:

While in a narrow and restricted sense the terms "commerce," or "commercial," and "trade" may be limited to the purchase and sale or exchange of goods and commodities, they may connote, as well, other occupations and other recognized forms of business enterprise which do not necessarily involve trading in merchandise. *Asakura* v. *Seattle*, *supra* [265 U. S. 332]. And although commerce includes traffic in this narrower sense, for more than a century it has been judicially recognized that in a broad sense it embraces every phase of commercial and business activity and intercourse. See *Gibbons* v. *Ogden*, 9 Wheat. 1, 189.

In the case of *May* v. *Rice*, 101 U. S. 231 (25 L. ed. 797), the Supreme Court defined trade as follows:

The word "trade," in its broadest signification, includes not only the business of exchanging commodities by barter, but the business of buying and selling for money, or commerce and traffic generally.

In view of the cases cited, we are of opinion that the voyage of the *George Washington* from New York to Seattle was a necessary part of her actual engagement in trade between the *United States* and *Alaska*. Under the foregoing definitions of the word "trade," the voyage from New York to Seattle must be regarded as commercial in character, and a voyage concerning which the vessel was suitable and seaworthy at the time of getting under way at the port of New York. The oil consumed as fuel by the vessel, therefore, is not subject to the internal revenue tax of one-fourth of 1 cent per gallon assessed thereon.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entry and refund the tax so assessed thereon.